BOND and others *vs.* THE MAYOR and COMMON COUNCIL of Newark and another.

1. The mayor and common council of Newark, in making improvements in the streets authorized by the charter to be made at the expense and for the benefit of the owners of adjoining lots, are, to a certain extent, the agents of these owners. They have neither personally, nor officially, nor as a corporation, any interest in the faithful performance of contracts for such improvements.

2. The municipal government can make contracts for such improvements which will bind the property owners, so far as authorized by law. But the property owners have the right to have such contracts, made at their expense, performed substantially in all things, and the corporation, or their agents, have no power to dispense with such performance.

3. The certificate of a superintendent, surveyor, or architect, who by the contract for any work, is to superintend its performance, and whose approval is required before any payment is due, cannot dispense with the performance of any substantial part of the contract, but may be binding as to the fact whether the work certified to was done in a workmanlike manner, or of proper materials of the kind required. But such certificate would not make building a brick house a compliance with a contract to build one of marble. Nor would the fact that a house built of brick is

Bond v. The Mayor and Common Council of Newark.

substantially, and for service, as good or better than one of marble, make such a building a performance of the contract, upon being certified to be so.

4. When a municipal corporation, or other agent authorized by law, or by the principal, to contract and pay for an improvement out of the funds of the principal, are willing to accept and pay for work done under a contract, which is clearly and beyond question, in substantial and important matters, not done according to the contract, such conduct is a breach of trust, and the payment will be enjoined by courts of equity.

5. The courts will not interfere with any municipal corporation in the performance of their legislative functions, or any discretionary powers, if within the authority conferred on them, but will, in proper cases, where the acts to be controlled are only ministerial.

Argued upon pleadings and proofs.

*Mr. Ranney*, for complainants.

*Mr. T. Runyon*, for defendant, O'Connor.

THE CHANCELLOR.

The bill is exhibited by James F. Bond and others, the owners of lots on Union street, in the city of Newark, between Hamilton and Elm streets. The defendants are the city of Newark, by its corporate name of the mayor and common council of the city of Newark, and Thomas O'Connor. The relief sought, is to prevent the city from paying to the defendant, O'Connor, the full contract price for paving, curbing, guttering, and flagging that part of Union street which lies between Hamilton and Elm streets, on the ground that O'Connor has not substantially fulfilled his contract, and that the city authorities, including the common council and their officers, the street commissioner and inspector, are grossly derelict in their duty in not attending to the substantial performance of his contract by the defendant, and are willing to pay him without requiring him to fulfill his contract, and colluded with him to defraud the complainants, whose property will be assessed for the whole expense, and who alone are affected by it.

There was an ordinance duly passed, to do this work. It

21*

directed that the expenses should be assessed according to the city charter, which directs them to be assessed on the adjoining lots; it also directed that the work should be done under the direction and supervision of the street commissioner, according to the city charter and ordinances. The common council, by resolution approved by the mayor, directed the street commissioner to advertise for proposals. The proposals were received, and the street committee, whose duty it was according to the ordinance relating thereto, awarded the contract to the defendant, O'Connor. A written contract, dated August 12th, 1863, was thereupon executed by O'Connor under his hand and seal, and by the mayor under the seal of the city.

O'Connor undertook to do the work according to the specifications annexed, for the prices to the different items specified in the contract. It was provided, that the work was to be done under the direction of the street commissioner, and to the satisfaction of the committee on streets and highways, and that all work and materials were to be subject to the inspection and approval of the street commissioner, or such other person as might be appointed by the mayor and common council to inspect the same; and that any work done, or materials furnished, not satisfactory to either of them, should be rejected, and other work done and materials furnished, satisfactory to them. The common council never appointed an inspector; several were successively appointed by the street commissioner, one of whom had been the foreman of the contractor in part of the work; they were all paid upon certificate of the contractor. The inspectors, the street commissioner, and the committee on streets, all approved the materials and work, on the ground that, although not literally or substantially according to contract, it was done as well as such work was usually done, and was on the whole a good job. And after the injunction was granted by the late Chancellor, the mayor and common council, by resolution, directed the estimate for the work to be paid to O'Connor in full, as soon as the injunction was

removed.   It is clear, then, that the work was done to the satisfaction and with the approval of all the city officials, including the common council, who, by the contract, or the ordinances of the city, are required or authorized to inspect or approve it.

But on the other hand, it is clear that the work was not done, and that the materials furnished were not substantially, according to contract.   The mayor and common council did not answer, and permitted the bill to be taken as confessed against them; they have really no interest in the question. O'Connor answered, and he and the complainants have taken testimony upon the matters in dispute.   Neither O'Connor in his answer or testimony pretends, nor do his principal witnesses say, that the work or materials were according to contract, but say that the materials and work are about as good as are usually furnished and done in this kind of work, and better than in some cases, and are good enough for the purpose.

The contract requires the roadway to be paved with cobble stones, carefully selected, not less than six inches in depth, nor more than ten inches in any direction.   O'Connor and his witnesses say, that the smaller stone averaged from four to six inches, and the larger were from ten to twelve inches; that there were some few over that.   The complainants' witnesses say, that there were some over twenty inches, and laid on their side.   It is clear from the defendant's evidence, that the stone were not carefully selected of the sizes limited in the contract, but that considerable quantities, both below and above the size limited, were used.

The cobble stone by the contract, were to be bedded in good clean gravel, twelve inches in depth; all sand was to be kept off until it was well rammed and inspected, and then it was to be covered with sand, again well rammed, and then covered with two inches of sand.   These stone were not bedded in gravel at all, but in fine sand, very fine sand, according to the defendant's own testimony, and that of his witnesses, and according to them not over ten inches in depth

on the average, and in some places over sixteen, of course in others much less than ten; the complainants' witnesses say that in many places it is not over three, and on the average not over eight inches deep. O'Connor's witnesses say, that sand is *as good* as gravel, and that the twelve inches required is made up by putting ten inches of it below, and two on the top, and that this twelve inches is all that he is paid for if he puts on two feet.

The curbstone was to be not less than three feet long, four inches thick, and sixteen inches deep, the upper side to be cut to a level (which by the general ordinance was to be a level of one inch,) and the ends to be squared. The complainants' testimony shows that many of them were less than three inches thick. O'Connor's testimony and evidence admits, that some of the curbstone are only three inches thick, and that it will not average over three and a half inches thick; that curbstone of four inches thick cannot be had; that *some* of it is beveled, *and some* is not beveled, but that being set below the surface of the flagging, it will shed water.

The bridge stone *was not to be less* than six inches thick. O'Connor and his witnesses admit, that they were not all of that thickness. He says, they averaged from four to nine inches thick, but does not say that they averaged six inches thick.

The gutter stone was to be not less than four inches thick, and the sides squared to form close joints. The complainants' witnesses say that they were from two and a half to three inches thick, and not at all dressed or squared at the side, and that they did not make close joint with the curb, but left interstices of one and a half or two inches. O'Connor says, they were from three to six inches thick, and averaged four inches in thickness; and he says that gutter stone is never dressed to make a close joint at the curb, and does not pretend that the sides of these were squared at all.

These are the principal departures from the contract, and they all are serious and substantial departures, even as ad-

mitted by the defendant. By a substantial departure, I do not mean that the work may not be as good or durable as that called for, but that is not the same, either in substance or in cost. A brick house may be as substantial and as durable as a marble or brown stone house, yet it is not a substantial compliance with a contract to build a marble house, if the contractor puts up one of brick, although proved to be more comfortable, substantial, and durable. Nor would it make it a compliance, if it were shown that it was as good a house, or a little better, than was usually built in the city where it was.

In this case the contract was for stone not less than six inches, or more than ten inches, in any dimension. It is to be presumed that such stone make a better pavement than a different size, or at least that it was thought so. At all events, stone of a uniform size, make a better looking and a smoother pavement, more pleasant to drive on. They were to be selected, that is the smaller and larger stone were to be rejected from the lot or parcel out of which they were bought. If they were no better, it was a wrong to the complainants that they were required by the contract; it must have increased the proposals of all fair bidders, who could not rely upon the favoritism of city officials to dispense with non-compliance. There can be no doubt but that the specifications were right, and that a pavement composed of stones of a uniform and medium size, placed on the end, is a much better pavement than the one laid down.

The requirement of twelve inches of clean gravel, is a substantial matter. Gravel must be taken to be better than sand, especially fine sand; and twelve inches better than ten or four; and uniform depth better than a varying depth. If ten or twelve inches are required, the pavement in the parts where it is only six inches deep, must be insufficiently bedded, and will necessarily give way sooner than the rest, or than if rightly bedded. And the difference in quality and quantity, would make a material difference to the contractor in cost. It is mere trifling to say that in a contract which expressly

requires twelve inches below the pavement, and two inches above, that the twelve inches is made up by putting ten below, and two above.

The variations in the thickness of curb, gutter, and bridge stone, are matters of substance. The contract calls for those of not less than specified sizes. Those sizes were the minimum to be admitted; that was required for strength and durability, and the requirement was everywhere the same. In proposals for a chain cable of inch iron, or a water pipe an inch thick, a cable with some links of half an inch, and some of an inch and a half, or pipes thus varying in thickness in different parts, would be accepted by no one, not even upon approval by a careless inspector. The absurdity is not so great here, but the principle is the same.

The approval by the street inspector and committee is relied upon as binding the complainants. They undoubtedly, by the contract, ordinances, and charter, are the proper persons to inspect and approve the work, and their decision as to whether the work was done in a workmanlike manner; whether gravel furnished was good, clean gravel; or whether any other materials were merchantable materials of the kind called for; would, perhaps, be binding. But they have no power to dispense with the contract, or anything that it requires in terms. An architect to whom, by the contract, everything was to be referred, could not hold, that a brick house was a compliance with a contract to build one of marble; or that steps of blue flag were brown stone steps; or that a wall twelve inches thick complied with a contract to make one of sixteen inches. He could determine whether the marble front, the brown stone steps, or the sixteen inch wall were put up in a workmanlike manner, but could dispense with no substantial matter expressly required by the contract. Such approval would not entitle the contractor to recover at law. I must, then, hold, notwithstanding the work and materials have been approved of by the inspector, commissioner, street committee, common council, and mayor, that the contract has not been substantially complied with.

If the mayor and common council were the party really in interest, for whose benefit and at whose expense the contract was made, as it is made in their name, the acceptance of the work by them would be conclusive. The real party has a right to accept a brick house as a compliance with a contract for one of marble, and if he accepts it as a fulfillment of the contract he would be bound to pay for it. But in this case, the mayor and common council have no interest, either individually or officially, or in their corporate capacity, in the performance of this work according to contract. The contract is made in the corporate name of the city, but it is for the benefit of the adjoining property, and at the sole expense of the owners of it. The mayor and common council do not even compose the corporation, with whom the contract is made; the inhabitants of the city compose that corporation, under the name of "The Mayor and Common Council of the city of Newark." The individuals who at the time are the mayor and aldermen, acting in their official capacity in the manner prescribed by the charter, are the agents of that corporation, and can bind it so far as authorized by law. And in this matter of street improvements, for the benefit and at the expense of the adjoining property owners, the city corporation and all the city officials are, to a certain extent, the agents of these property owners. It was so held in a like case, by the Supreme Court of New York. *Lake* v. *The Trustees of Williamsburg*, 4 *Denio* 523. They are made such agents by law, by the provisions of the charter; and except when greater power is expressly given them, their acts must be judged of by the law regulating the powers of agents.

How far courts have the power to control the acts of municipal corporations, is a question about which there has been some doubt and difficulty; but it seems to be now at rest. When municipal corporations exceed their powers, even by acts done in the form of legislation, the courts of law can restrain them by reversing and setting aside such unauthorized legislation.

But all legislative acts or exercise of discretionary powers, within their authority, are beyond the control of the courts, however unwise or impolitic, or even when done from corrupt motives, or unworthy purposes. Their legislative powers are, when exercised within their authority, supreme. In this case the ordinance directing the improvement was a legislative act, and its provisions, however absurd, could not have been reviewed. Had they directed a sidewalk only a foot in width, or that the street should be paved with Carrara marble, at a cost of $16 per foot, the courts could not have interfered, even if satisfied that the provision was for the purpose of enabling some favorite who had a lot of Carrara marble, to dispose of it. But when the corporation have fulfilled their legislative functions, and have exercised their legislative discretion, and are about to fulfill a contract by paying for its performance with the money of the lot owners, they are not acting in a legislative capacity, but as agents. And if they should accept a pavement of blue flagstone, worth sixteen cents per foot, in fulfillment of a contract to pave with marble worth $16, without any abatement in price, they would exceed their powers as agents, and in a case as strong as that, no court could avoid the conclusion that there was fraudulent collusion between them and the contractor.

In this case, the ordinance requires the street commissioner to advertise for proposals, and although the street committee may not have been obliged to accept the lowest bid, yet the proposals of all competitors would be guided by the specifications, unless there were some favorite contractor, who knew that the officials would dispense with his complying with them. If such was the object or the understanding of the committee or commissioner, it would prevent all fair competition, and was a fraud upon the law and ordinances, to the injury of the complainants. If four inch curb stone could not be obtained, or was so much more expensive than three inch curb that it would not be required, the specifications should have been for curb not less than three inches.

If sand is as good as gravel, and ten inches as good as twelve, it should have been called for in the specifications; and if the deficient work and materials are really sufficient, the difference in cost should not enure to the benefit of the contractor, but to the parties for whose benefit and at whose cost the work was done.

That courts have the power, and should interfere to control the acts of municipal corporations and their officers in the exercise of powers not legislative or discretionary, is settled by a series of cases in the state of New York, upon principles applicable here, and which appear to me to be sound and correct. *Christopher* v. *The Mayor of New York*, 13 *Barb. R.* 567; *Stuyvesant* v. *Pearsall*, 15 *Ibid.* 244; *De Baun* v. *The Mayor of New York*, 16 *Ibid.* 392; *Wood* v. *Draper*, 24 *Ibid.* 187.

The evidence in this case shows gross negligence in not requiring O'Connor to perform parts of his contract expressly stipulated for, which were not left to the discretion of any one; negligence so great, that if it does not warrant the inference of fraudulent collusion, yet of itself amounts to legal fraud. Agents or trustees, who accept the office of attending to duties on behalf of others, in which they themselves have no interest, and then neglect their duties, or perform them in such manner as to sacrifice the interest of those for whom they profess to act, in favor of a third party, are guilty of a breach of trust which in equity is a fraud.

The only remedy in such case, if the city authorities will not resist the claim, is in equity. If the land owners stand by and see the city pay the contractor, they can have no relief against the assessment. This was so held by the Court of Errors, in the case cited by the counsel for the defendants. *The State* v. *Jersey City*, 5 *Dutcher* 441.

In this case, as the work was accepted, and the street has been for years in public use, it would not be equitable to compel O'Connor to put his work now in such condition as was required by the contract. The only remedy is to make such deduction from the price as justice requires. The

deduction to be made is the difference between the cost of the work if it had been done, and of the materials if they had been furnished according to the substantial requisitions of the contract, and their cost as done and furnished.

For this purpose, it must be referred to a master to ascertain and report what would have been the additional cost to O'Connor, if, at the time this work was done, he had substantially and fully complied with every express requisition of his contract, and this without regard to the fact whether the work completed in that manner, would have been materially better than as it was done.