# The Coast Company

## v.

## The Mayor and Common Council of the Borough of Spring Lake et al.

### [Filed December 12th, 1896.]

1. While a court of equity will not, as a rule, correct irregularities in municipal procedure, it will nevertheless restrain an irregular proceeding if it threatens irreparable injury.

2. A municipality, as the representative of the public, may sue to abate or prevent a nuisance upon public property within its limits.

3. The power of a municipal officer to abate a public nuisance without statutory or judicial process, stands upon the same footing as the power of a citizen.

4. The fact that a general statute for the formation of boroughs has been judicially declared to be unconstitutional in an action brought by the attorney-general to test the *de jure* existence of one corporation formed under the act, cannot, in a collateral suit, affect the existence or powers of another borough organized under the same act.

5. Where the objection that a party has an adequate remedy at law is not taken until after the testimony is all in, the court, in its discretion, will retain the cause if the court is competent to grant the relief asked for and has jurisdiction over the subject-matter.

6. The common council of a borough, by resolution, threatened to tear down a building being erected on land which it claimed was dedicated to public use. A bill was filed to restrain the borough and its officers. The borough answered, setting up a dedication of the building site, and also filed a cross-bill upon the same ground, praying that the nuisance might be abated.—*Held*, that the action of the borough council was irregular; that the injury threatened was irreparable and that the nuisance was not such as a municipal officer could abate at common law; therefore, their threatened acts will be restrained. But further—*Held*, that as to the case made upon the cross-bill—no objection to the jurisdiction of the court having been made until the evidence was concluded, and it appearing that the dedication of the land is reasonably clear—the court will retain the cause and decree an abatement of the nuisance.

---

This bill is filed by the Coast Company to restrain the defendants from tearing down certain buildings in the course of erection along the edge of Spring·lake, within the limits of the

borough of Spring Lake, on land which the latter claims has been dedicated to public use.

The admitted facts are these: About the year 1875 several gentlemen conceived the notion of creating a seaside resort on the Atlantic coast. They caused to be purchased a tract of land within the limits of the township of Wall, in the county of Monmouth. On March 15th, 1875 (*P. L. of 1875 p. 100*) these gentlemen caused an act to be passed incorporating the Spring Lake Beach Improvement Company, with power to buy land, lay it out and locate streets and lines of division thereon and to sell the property. The land so purchased was conveyed to this corporation. By direction of the corporation, a map of the property was made in 1875 and filed in the office of the clerk of the county of Monmouth. Within the boundaries of the tract was a fresh-water lake, which was christened "Spring Lake." Around this lake, on the map, was delineated a street marked "Lake Avenue." Between the avenue and the lake was a margin of land, and at certain points upon this strip, where the lake, by irregularities in its shores, receded from the street, there were certain marks to denote shrubbery. With the exception of another portion of the tract, marked with the same indication, and of a square marked "Farm Land," the remainder of the entire tract was plotted into lots and streets.

In 1878 a new map was made by the same surveyor who had made the preceding map, but modifying the original map by slight changes in the course of Lake avenue, around the lake, and marking two lots within the avenue, at the northwesterly end of the lake.

The company, by its agents, proceeded to sell lots. Such agents, by authorization from the company, represented to those whom they solicited to become purchasers that the lake would remain open to the use of the lot-owners, or that the lake would remain open to the use of the public. The sale of the lands by the original corporation continued until December 19th, 1889, when that corporation sold all its interest in the land to a new company incorporated under the name of "The Spring Lake

and Sea Girt Company." The control of the land and the sale of the lots were thereafter conducted by the latter corporation.

On February 20th, 1893, the latter company sold a portion of the said tract to the complainant, the Coast Company. The part so sold included the southerly end of Spring lake, opposite the Monmouth House. The deed purported to grant the right of hiring pleasure boats on the lake, and contained a clause that the grant should not prevent the Spring Lake and Sea Girt Company from giving to resident property-owners or guests the free use of the waters of the lake for the enjoyment of themselves, their friends and visitors. The Coast Company, in 1895, began the erection of five frame stores, one story high, on the edge of the lake at its southerly point.

In 1893 a new municipal corporation was created, known as the borough of Spring Lake. It included within its territorial. limits all the land of the original Spring Lake Beach Improvement Company. On June 17th, 1895, the borough council passed a resolution wherein it was stated that whereas certain persons were, without authority of law and to the common nuisance of the public, erecting a building on the lake and its banks, and said persons, although notified by the mayor to discontinue said work and remove said structures, were still prosecuting the work, it was resolved that the mayor cause to be affixed to the said structure a notice that the same must be removed within twenty-four hours, and, if the said notice was not complied with, then the mayor was authorized to cause said structure to be torn down and removed. It was resolved that the mayor should appoint ten persons as policemen.

The bill in this case was then filed for the purpose of restraining the borough and its agents from carrying out the purpose announced in the foregoing resolution.

The answer to the bill sets up that the borough is organized under "An act for the formation and government of boroughs," approved April 2d, 1891. It insists that the borough, as the representative or trustee for the inhabitants of the borough, was invested with the authority to protect the rights of the people and inhabitants of the borough in the lake, grove and grounds surrounding it as property devoted to public uses.

*Mr. Edwin Robert Walker* and *Mr. James Buchanan*, for the complainant.

. *Messrs. Hawkins & Durand* and *Mr. Richard V. Lindabury*, for the defendants.

REED, V. C.

The question litigated at the trial was whether the site upon which the complainant was erecting the structures, was public ground. Apart from the merits of its cause upon this ground, however, the complainant insists that it is entitled to a decree restraining the defendants from carrying out their purpose. It is pressed as a tenable proposition that, even if it be admitted that the *locus in quo* has been dedicated to public use, nevertheless the defendants had no authority to interfere with complainant's buildings, and that this court will restrain their threatened attempt to do so. The mayor and members of the common council, it is argued, cannot invoke any official authority to justify their proposed acts; that it therefore follows that they must be regarded not as officials, but only as citizens of the borough, and that as citizens they have no right to abate a public nuisance unless it inflicts some special private injury upon them distinct from that of the public.

If the first step in these series of propositions is admitted, the others legally follow.

It is entirely settled that the authority of a private person to abate a public nuisance arises entirely from the fact that it interferes with some special individual right possessed by him distinct from the general rights of the public. *Brown* v. *De Groff, 21 Vr. 411.* It is clear that nothing appears in this case to exhibit the existence of any special injury to any one of the defendants likely to flow from the presence of those buildings. The defendants, therefore, must justify by virtue of some official authority. Indeed, the defendants do not pretend to claim a power to do the proposed acts as private citizens, but they claim to have been invested with an official character by which, as the representatives of the people, they possessed authority to abate

public nuisances within the borough. Upon this point the parties are at issue.

It is admitted that the defendants were officers of a going municipal corporation organized under the general statute (*P. L. of 1891 p. 280*), and that under this general charter these officers had power to pass ordinances, *inter alia*, for preventing or removing all obstruction, encroachment, encumbrances and nuisances from the streets, roads, highways, sidewalks, alleys and enclosures and lands in the said borough.

It is thus perceived that upon the mayor and common council was conferred a general authority over nuisances existing upon the streets and elsewhere. It is upon this power that they put their jurisdiction for the acts proposed in the resolution of the mayor and common council.

The complainant, however, denies that the pretended resolution possessed any official quality whatever. Its denial is put upon two grounds—*first,* that the act under which the borough of Spring Lake was organized, and. which purports to confer upon the mayor and common council this power over obstructions in the streets and other public places, is unconstitutional; *second,* that if the act itself cannot be attacked upon this ground in this suit that then the charter of this municipality has defined the manner in which the power is to be exerted, namely, by ordinance, while in fact the common council, in this instance, had attempted to exert it by resolution.

In support of the first of these propositions I am referred to the case of *State* v. *Borough of Cape May Point,* in which it was held by the supreme court, on the authority of the case *In re Ridgefield Park, 25 Vr. 288,* that the act of 1891, under which this borough was erected, is unconstitutional. In the case of *State* v. *Borough of Cape May Point* the attorney-general had permitted an information to be filed in his name to test the legality of the corporate existence of the borough, and the court held adversely to the existence of the municipality attacked.

I am unable, however, to perceive in what way the decision in that case can, in this suit, introduce the question of the corporate existence of the borough of Spring Lake. The force of

the judgment in the preceding case was spent when it annulled the corporate existence of the borough of Cape May Point. It is of course obvious that the decision in that case will be controlling as a precedent whenever the question of the constitutionality of the same act arises in a shape to be passed upon. The question can be raised by an attack upon any step taken to organize a borough under the provisions of the act by means of a *certiorari* allowed before the corporation has become an existing entity.

After the corporation has been organized its existence can be called in question only by an information in the nature of a writ of *quo warranto* allowed by permission of the attorney-general. No unconstitutional feature in the scheme provided by the legislature for the institution of such a municipal corporation can be made a ground for refusing to recognize the corporate function of a municipality so created when the corporate existence is involved in a collateral proceeding. *Harvey* v. *Philbrick, 20 Vr. 374; Steelman* v. *Vickers, 22 Vr. 180.*

No matter how clearly unconstitutional are the provisions of the general act providing for the organization of a municipality; no matter if in some other suit similar statutes or the same statute have been decided to be inimical to the constitution, nevertheless such a municipality is a *de facto* corporation until its municipal existence is annulled by a direct proceeding instituted for that purpose. The borough of Spring Lake, in this proceeding, must be regarded as a *de facto* corporation possessing the powers conferred upon it by its charter.

The second ground taken against the legality of the proceedings of the mayor and common council of Spring Lake is that they did not pursue the course marked out in their charter, in their attempt to cause the removal of complainant's buildings. It is insisted that the proceedings should have been by ordinance and not by resolution.

Now, it has been decided over and over again that when a charter prescribes that a municipal action shall be taken by ordinance, it cannot be exercised by resolution. But the answer made to this point is that the complainant cannot avail itself of

this irregularity in a suit in equity; that the question of irregularity can only be raised on *certiorari;* that, therefore, although it may be admitted that the course taken was irregular, yet, if there resided in the borough authorities a right to cause an obstruction upon the public domain of the city to be removed as a nuisance, and if these buildings are of this character, in such case this court will not restrain the borough from pursuing its object, notwithstanding the fact that it is not proceeding in the manner pointed out by its charter.

In further pursuance of this line of argument the defendant insists that, aside from the power conferred upon the borough which is exercisable by ordinance, it has a special interest in the public property within its limits, which invests the municipal authority with the right to abate any encumbrance upon or obstruction to its use by the public. It is, therefore, insisted that this court will pass upon the question whether the site upon which these buildings are placed is dedicated land, and that if it should be found to be such the court will dismiss the complainant's bill. In support of this position the following authorities are cited: *Morris Canal and Banking Co.* v. *Jersey City, 1 Beas. 252; S. C. on appeal, 1 Beas. 547; Newark Lime and Cement Co.* v. *Newark, 2 McCart. 64; Pope* v. *Town of Union, 3 C. E. Gr. 283; Van Doren* v. *Mayor of New York, 9 Paige 388.*

These cases, however, do not support the proposition as thus broadly stated. It is undoubtedly true that a court of equity will not, as a rule, concern itself with irregularities in municipal procedure. If, however, some other matter of equitable cognizance becomes entangled with or is the outcome of such irregularities, courts of equity do not hesitate to intervene. For instance, if an irregular municipal proceeding will lead to an injury which is otherwise irreparable, it will be restrained. In *Morris Canal and Banking Co.* v. *Jersey City, supra,* the common council of Jersey City had passed an ordinance to extend Hudson street over the canal of the complainant. It appeared that it was the intention of the city to remove a building and to convert a part of one of the company's piers into a public street.

Coast Company v. Spring Lake.

The ground of complaint was that Hudson street did not run over this part of the canal company's property. One of the answers to the bill of complaint, which was filed to enjoin the city from interfering with the building and pier, was that the ordinance of the city, even assuming that no street existed where it was proposed to open the street, was merely irregular, and so the matter was not cognizable in a court of equity.

Chancellor Williamson, while conceding that a court of equity was not the proper tribunal to correct irregularities in inferior jurisdictions, held that there was no irregularity in that case, because the only question was whether there was a street, which he concluded " was a ground entirely distinct from a question of irregularity of procedure." He also held that the case was taken out of the general rule because it came within the well-recognized exception of irreparable injury. He also held that there was no dedication of the *locus in quo* to the purposes of a street and thereupon restrained the city. On appeal, the court took the view that there was a dedication and so dismissed the bill.

It is perceived that the only question was whether there was an existing street. If there was, then the proceedings taken by the common council to open it were entirely regular. After the chancellor had decided that the question of street or no street did not involve a matter of regularity, and after the court of appeals held that there was a street, neither court was called upon to say what the result would have been had the city proceeded in an irregular way to open and remove obstructions from what was in reality a highway.

So, in *Newark Lime and Cement Co.* v. *Newark, supra,* there was no question of irregularity in the method of procedure in directing certain alleged encroachments upon a street to be removed. The only question was whether there was a street where the alleged obstructions were placed. If so, the regularity of the method adopted for their removal was admitted.

So, the case of *Pope* v. *Town of Union, supra,* presented the same condition of affairs. An ordinance had been regularly passed in pursuance of the municipal power granted to open

streets. The only question was whether the street intended to be opened was a public street.

The case of *Van Doren* v. *Mayor of New York, supra,* was a suit to set aside an irregular special assessment as a cloud upon the title to complainant's land. The court held that, as there was an adequate remedy at law, it would not interfere in this case, nor in any case of that kind except where it was absolutely necessary for the preservation of the complainant's rights.

None of these cases, it is perceived, involved the question whether, if a municipal corporation to whom is confided the power to remove obstructions from streets, to be exercised in a definite way, proceeds in a different way, a court of equity will interfere, even if there exists an obstructed street.

The inference to be drawn from these cases is that if such irregular action threatens irreparable injury, a court of equity will assume jurisdiction. In the cases of *Mayor of Brooklyn* v. *Messerole, 26 Wend. 132,* and *Haywood* v. *City of Buffalo, 4 Kern. 534,* the doctrine that a court of equity would not review and correct errors and mistakes in the exercise of the powers of subordinate public jurisdictions and in the official acts of public officers was subject to two exceptions—first, where the proceedings lead to the condition of irreparable injury to the freehold, and second, where they lead to a multiplicity of suits. These cases were followed, and the first exception was recognized as one of the grounds for retaining jurisdiction in the case of *Morris Canal and Banking Co.* v. *Jersey City, supra.*

Nor do these cases, or the case of *Van Keuren* v. *Manhattan Manufacturing and Fertilizing Co., 8 C. E. Gr. 251,* support the notion that the defendants, as representatives of the city, had a right to destroy these buildings by virtue of an inherent authority in the borough to abate a nuisance at common law.

In the last-named case the court was speaking of the power of citizens as such, and not as representing the corporation. The language used in the opinion in that case in respect to the power of private citizens has been modified by the case of *Brown* v. *De Groff, supra.* The authority to abate a public nuisance without judicial order or without following a procedure pointed out

by statute is no greater in a person as officer than as a citizen. Either can abate an absolute obstruction in the street which prevents his passage and so does him a special injury.

The case of *Inhabitants of Greenwich* v. *Easton and Amboy Railroad Co., 9 C. E. Gr. 217 ; S. C., 10 C. E. Gr. 566,* was an instance of an appeal to the courts. It is by confusing the right of the individual with the acts of officers that the courts, in some cases, have alluded to the existence of a common-law power in a municipality to abate a nuisance in a way that would mislead to the notion that the authorities had an inherent power to do what they, as citizens, could not do.

But if it should be conceded that the degree of special injury which would justify the abatement of a public nuisance is not to be so nicely measured when a citizen is also a municipal officer as when he has no official character, yet, in my judgment, the present case would not be one for private interference. It is of the utmost importance to the preservation of the rights of property as well as the public peace, that the exertion of this exceptional power should occur only in cases of necessity—in cases where the nuisance is manifest and unmistakable and where the danger or inconvenience is imminent and serious. There exist no such conditions in this case. The structures are not in a public street, blocking traffic, nor so placed in a public park or square as to seriously impair the use of the same by the public. If they are upon dedicated land they are a purpresture or nuisance, but the injury resulting from their presence is not of such presently grave character as calls for immediate abatement by act of the party. The importance to the city of the presence of these structures upon the site selected arises from the fact that the complainant is asserting a right which, if permitted to remain unchallenged, will lead to a series of obstructions around the lake which will practically destroy its beauty and impair its use by the public. Therefore, as I think, there was no power to abate in the method adopted, and as the result of the threatened demolition of the buildings comes within the pale of irreparable injury, this court will restrain without determining the question of dedication ; for it cannot be granted that when a per-

son comes into this court to restrain an act of this kind he thereby, as a matter of course, submits the question of dedication to this court. If this should be so held, then municipal officers, by a sudden and summary attack upon property which they claim to be a nuisance, can drive its owner into this court for protection and so compel him to try in equity a matter otherwise triable only at law. I am therefore of the opinion that the complainant, upon the original bill, is entitled to a decree.

But the case does not rest alone upon the bill and answer. There is a cross-bill, which prays that the structures may be abated by a decree in this court.

Against the relief prayed for by this cross-bill there are interposed several objections, even assuming that there was a dedication of the land by which the buildings were erected.

It is objected, first, that the cross-bill is not germane to the original subject-matter; second, that the proceedings should have been taken by information at the instance of the attorney-general; third, that the borough had passed no ordinance upon the subject of nuisances, and fourth, that the remedy by ejectment or indictment is entirely adequate.

None of these objections are taken in the answer to the cross-bill, but are raised for the first time upon final hearing.

*First.* The answer is good as an original bill, in the nature of a cross-bill.

*Second.* The borough, as the representative of the public, was entitled to file the cross-bill. *1 Am. & Eng. Encycl. L. (2d ed.) 74; Mayor of London v. Bolt, 5 Ves. 129; Trustees of Watertown et al. v. Cowen et al., 4 Paige 510; Inhabitants of Greenwich v. Easton and Amboy Railroad Co., 10 C. E. Gr. 565; Inhabitants of Woodbridge v. Inslee, 10 Stew. Eq. 397; Newark Aqueduct Board v. Passaic, 18 Stew. Eq. 394; 1 Dick. Ch. Rep. 552.*

*Third.* The borough could bring the suit for abatement of a nuisance *per se* without the passage of an ordinance. The purpose of an ordinance would have been to declare what were nuisances, aside from nuisances *per se;* to empower certain officers to act concerning nuisances, or to provide a summary method

40

for the ascertainment of nuisances and for their abatement.   But when a general right of control over public property is vested in a municipality it can invoke the aid of the courts for the protection of this property, without resorting to a summary method of abatement provided by its charter.

"The selectmen of Jersey City," it was said in *Dummer* v. *Jersey City, Spen. 86*, "by the act of incorporation, represented the public or the inhabitants of Jersey City, and the rights of the public in the common property are vested in them, and if such rights cannot be enforced in their name they cannot be enforced at all."

Mr. Justice Depue, in his opinion in *Trustees of Methodist Episcopal Church of Hoboken* v. *Council of Hoboken, 4 Vr. 17, 19*, says: "The corporation of the city or town in which the square is, have, by virtue of their corporate authority, power to regulate the public use of it, and may be regarded as representatives of the public, for the purpose of maintaining suits in equity or at law for the vindication of the public right."

Chancellor Walworth said, in *Trustees of Watertown* v. *Cowen, supra:* "I can see no valid objection to considering the corporation as the proper representative of the equitable rights of the inhabitants of the village to the use of the public square, so as to authorize the filing of a bill by the corporation in this court, to protect those equitable rights against the erection of this nuisance."

All the cases in this state in which similar actions have been sustained rest solely upon the right of the municipality, as representing the public, to protect the interests of the public in property devoted to public use.

The *fourth* objection, had it been taken in the answer, I should have regarded as unanswerable.   There arises, as I have already observed, no imminent or serious injury to the public from the presence of the structures now alleged to be nuisances ; therefore, the remedy open to the borough through an indictment or by an action of ejectment would seem to be altogether adequate.

The question, however, is whether now, after voluminous testimony has been taken, and after the case is ripe for final deci-

Coast Company v. Spring Lake.

sion, the cross-bill shall be dismissed on this ground and the defendants sent to a court of law.

In the much-cited case of *Attorney-General* v. *Heishon, 3 C. E. Gr. 410*, Chancellor Zabriskie, while asserting the doctrine that a court of equity would never retain jurisdiction in cases of nuisances where there was an adequate remedy at law, nevertheless held that, by the testimony in that case, the fact whether there was a nuisance was left in doubt.

Of the cases cited by Chancellor Zabriskie, it appears that in *Allan* v. *Board of Chosen Freeholders, 2 Beas. 68*, a citizen who had suffered no special injury from the public nuisance was refused relief upon motion to dissolve an injunction; in *Attorney-General* v. *Hudson River Railroad Co., 1 Stock. 560*, the injunction asked for was allowed; in *Attorney-General* v. *New Jersey Railroad and Transportation Co., 2 Gr. Ch. 140*, the relief was denied upon the ground that the nuisance was already there and that injunction was a preventive remedy only.

The recent case of *Township of Raritan* v. *Port Reading Railroad Co.; 4 Dick. Ch. Rep. 11*, was decided on a rule to show cause why an injunction should not issue.

The general rule is that a court may, of its own motion, dismiss a bill at any stage of the cause, on the ground that the complainant has an adequate remedy at law. But where the defendant has not raised the objection until after testimony on the merits has been taken, the court, in its discretion, will retain the case if the court is competent to grant the relief prayed and has jurisdiction over the subject-matter. *Lehigh Zinc and Iron Co.* v. *Trotter, 16 Stew. Eq. 185*, and cases cited by Mr. Justice Depue in his opinion.

I have concluded that this suit should be retained. While it is true that the legal rights of the parties have not been once settled by an action at law, and while there is no question of irreparable injury to the public involved, yet there is involved no doubtful question of law, the material facts are not obscure or controverted, and the inference to be drawn from them, in regard to the question of dedication is, in my judgment, reasonably clear.

The question therefore remains, was there a dedication of the ground upon which the buildings stand?

It is proved beyond a doubt that the board of directors of the original land company, for the purpose of securing purchasers for their lots, empowered those persons who were to sell lots to represent to all who spoke of becoming purchasers that the lake and its surrounding ground was to be kept open. There is a mass of testimony to the effect that the power given to make representations, and that the representations made, were to the effect that the lake and grounds were to be kept open for the use of the public. But it is not entirely certain whether the power given was to make representations that this land and water were to be kept open for the lot-owners or were to be kept open for the public, or were simply to be kept open. The witnesses were trying to recall language used in conversations which occurred twenty years ago, and not much reliance can be put upon their recollection of the precise words used in regard to the point whether the lake and banks were to be kept open for the use of the lot-owners or whether they were to be kept open for the use of the public. That they were to be always kept open and that the agents of the company were authorized to so represent, and that they did so universally represent, is proved beyond all question.

Again, that it was never intended that the fringe of land between Lake avenue and the waters of the lake should be the subject of profit to the land company, by sale or private use, conclusively appears from one fact, namely, that in arriving at the cost of the lots which were plotted upon the company's plan, the cost of the whole tract was divided so as to fall entirely upon the plotted lots. This was done for the purpose of fixing a price for the lots and upon the theory that from their sale alone was the original expense for the entire plot and the profits of the company to be realized.

But assuming that the representations were simply that the land and lake were to remain open, what inference, as to the intent of the company, is to be drawn? What future condition

of affairs must have been in mind as the outcome of such a representation ?

The purpose of the company was to organize a seaside settlement. The size and the number of the lots upon which dwellings were to be erected indicate that the design of the projectors was to found a village—an urban community. The lake and park were to be kept open undoubtedly for the use of all who owned or rented these houses. Among the first projects of those interested in the land company was the erection of a hotel, the present Monmouth House. The lake and park were to be kept open for the use of the guests of this house. Indeed, they were to so remain for the common use of the residents and their guests, of the hotel and its guests; in fact for all who were attracted to the place because of its character as a summer resort. It was intended that no portion of the public who were likely to enjoy them was to be excluded from such rights, and this constituted a dedication.

Again, Samuel B. Huey purchased the ground for the company and was its original secretary. He filed the map of the land company in the county clerk's office of Monmouth county, after being advised by legal counsel that a filing of the map would amount to a dedication of the streets and lake and park to public uses, and this advice he communicated to the company, who thereafter proceeded to sell lots delineated upon the plan.

While the effect of filing the map would not amount to a conclusive dedication of the lake and the surrounding fringe of land, yet the appearance of the plot itself, leaving this fringe unplotted into lots, in some places too narrow for plotting purposes, in others with shrubbery marked upon it, would carry a strong implication to any person viewing it that the strip of land between Lake avenue and the lake itself was never to be enclosed and was to be used as a park.

The force of the filing of this map springs out of the information which Mr. Huey received as to its effect, of his communication of that information to the company and of the sale of lots thereafter.

And then again, from the time the map was filed and lots

were sold and lot-owners began to build, the lake, with the walk around it, was used by all; the park was kept open, walks were built upon it and was, so far as appears, free for the use not only for lot-owners, but for all.

Again, about eight years ago General Lucas, who then owned nearly or quite all of the stock of the company, called a meeting of the citizens of the village and proposed that inasmuch as the company had disposed of most of its land, that the expense of keeping the streets, park and lake in order should be borne by all the property-owners. A committee of citizens was appointed to take charge of those affairs, under an agreement with the company that the company should pay one-third of the expense and that two-thirds should be assessed upon the other lot-owners. This voluntary assessment was collected and the committee spent it in repairing streets, in cleaning out the edges of the lake, in making an island in its waters, in renewing the boardwalk running partly around the lake and in planting trees in and in otherwise beautifying the park. A citizens' meeting was held in the park to raise money for the same purpose, which money was expended in building a walk on the west side of the lake.

Mr. Lucas also refused permission to Mr. Truett to put up a pavilion on the peninsula and enclose it with glass, saying that it was public property, and that there could be none built there.

So from the intention of the directors thus proved; from the representations to lot-owners, which raised an equitable estoppel against the closure of the park and lake against them; from the constant use of the park by the public since 1875, I do not see how it can be doubted that there was a dedication.

But the complainant sets up certain conduct of the owners of this land, as well as certain acts of the borough, as tending to refute the idea of such dedication.

It is first pointed out that the company changed the contour of the lake by filling in and encroaching upon the water at certain points; that it put a curbing around the lake, cleared the strip of land around it of underbrush, and trimmed the trees in the park and laid the boardwalks around the lake. But all this was a part of the general plan to improve and beautify the lake

and park, so as to make them more attractive and so induce persons to purchase lots. There was no one to do these things. The township of Wall had no interest at this stage of the enterprise to take charge of these improvements, at the expense of the people of the township, for the benefit of the land company. All these acts were done as part of the scheme of improvement, which included the opening and grading of streets and forming of sidewalks. As to the streets, no one would contend for a moment that these acts would tend to refute the idea of dedication.

Now, as Mr. Huey states, the company was in the market to sell lots, and it had to have streets by which to sell lots. It was a case of necessity; there was no other authority to do it, and, until there was some other organization, it was understood that the company would assume that task. These were all acts similar to those of the owner of the fee in a highway, who plants trees upon or forms and sods the side of the road, or even grades the wagon track.

The complainant also relies upon the fact that ice-houses were erected by the company upon the peninsula, and that ice was got from the lake and sold by permission of the officers of the land company.

But this, in my judgment, has little or no force to disprove the intention to dedicate. The houses were not erected until 1886, when the dedication was complete. Besides, the presence of the ice-houses was obviously for the purpose of storing ice mainly for the use of residents, and so was a convenience to them about which they did not care to complain. The presence of the houses in no way interfered with the use of the lake for the purposes of summer visitors. Nor did the money received from the ice sold, so far as appears, arise from the sole right of the company to cut. It is not proved that the company ever collected for ice cut by others. And the cutting of hay from the parks stands in the same posture. It interfered no more with the common use of the public than would the act of the owner of the fee in a highway in cutting grass upon or pasturing on the roadside.

It is said that the company let the privilege of hiring boats to be used upon the lake, and it appears that the Monmouth House and the Lake House provided boats for the public use, undoubtedly mainly for the convenience of their guests. These boats were essential to the use of the lake and were in furtherance of the purposes for which it was to be kept open. The boats were put under the charge of a keeper, who paid certain sums to the owners of the boats. No one else was excluded from the use of the lake, and the hiring of the boats no more proves a claim of any private right in the lake than would the fact that the owner of an omnibus line had hired out his vehicles to one person prove that he claimed a private right in the streets through which they ran. The platform from which the boats started was not such an obstruction to the use of the lake and its surrounding grounds as to provoke a question of right.

So, the permission asked of and given by the employes of the land company to permit lot-owners to put boats upon the lake and put up boat-houses and platforms was not inconsistent with the right of the public to the use of the lake. A request to the citizens was made to these persons because they were managing and controlling, in the absence of any public authority, the use of the lake for lot-owners as well as the general public.

Nor do I see how the fact that the company, by deed, dedicated a long, triangular lot in 1882 and another in 1885, both lying outside of Lake avenue, proves that the strip inside of that avenue was not previously dedicated. The only acts which asserted an exclusive right to any of the property within Lake avenue was the act of Mr. Lucas in 1886, in negotiating for the sale of a portion of the peninsula, which portion seems to have been afterwards sold. But these acts were ten years after the map was filed and after the dedication had become complete.

But it is again said that, after the formation of the borough in 1892, the borough authorities in various ways admitted that the lake and surrounding park were private property. On April 3d, 1892, and on August 15th, 1892, the common council directed its clerk to notify the Spring Lake and Sea Girt Com-

pany of the dangerous condition of the boardwalks around the lake, and directing the company to repair them.

On January 28th, 1895, the common council appointed the mayor a committee to wait on the owners of the beach and the lake and the sewer system within the borough of Spring Lake, to ascertain whether they were willing to sell the said property, and, if so, upon what terms.

Now, it is apparent that, if there had been a dedication of the land around the lake, that act was complete long before the organization of the borough. It arose by the filing of the map, with the understanding that it would constitute a dedication, by repeated declarations that this space would remain open; that from 1875 it had remained open, the fringe of land being used as a park where everyone sat or walked. It is apparent, therefore, that the resolutions of the common council can have no official significance whatever as to the rights of the public. The legislature had conferred no power upon the common council to discharge this property from the public easement. The power to vacate streets had not been put into action by the passage of an ordinance. The resolution of the common council amounted to nothing more than the expression of the individual members; that the land company had or claimed some right in the lake or surrounding land, and that it had an admitted right in the sewer system. The common council had apparently taken no legal counsel in respect to the existence of any private right in the land company, and its action was of no importance in determining the existence or extent of such right.

The testimony respecting the manner in which the property has been from time to time assessed had, to me, no significance whatever.

The fact that upon the second map—that of 1876—two lots were plotted within Lake avenue, at the northwesterly end of the lake, in view of the evidence of how this came to be done and of the action of the land company concerning it, makes in favor of rather than against the existence of an intention to dedicate. The lots were so plotted by the surveyor of his own volition, and his act was disapproved of by the company as soon as it came to

its attention. It is finally objected that if dedicated, there has never been an acceptance of the dedication of this property.

Acceptance requires no formal act.

The resolution of the mayor and common council was an assertion of a right of control over this property, equivalent to an acceptance for the public of the use tendered by the dedication. Besides, there had been a public user of the property for nearly twenty years.

I am of the opinion that the land upon which the buildings were put is public ground; that the buildings are public nuisances and that there should be a decree upon the cross-bill for their abatement.