*84 N. J. Eq.*                Simmons *v.* City of Paterson.

CATHERINE SIMMONS et al.

*v.*

THE CITY OF PATERSON.

[Decided November 6th, 1914.]

1. The rule formulated in *Doremus* v. *Paterson*, *73 N. J. Eq. 476; 81 N. J. Eq. 27*, and *82 N. J. Eq. 640*, followed in ascertaining the damages sustained by the complainants in respect to their riparian lands bordering on the Passaic river by reason of its pollution by the sewage of that city.

2. A property is riparian when, in a conveyance thereof, the premises are described as beginning "at the Passaic river," which in legal parlance means at the *medium filum aquæ* and, by the course of one chain from the road, it is carried back to the river as it used to flow.

3. A property is also riparian when, in a conveyance thereof, the premises are described as running "thence (5) on the east side of the lake road, one hundred and ninety-one feet to the lands of Peter P. Kip; thence (6) easterly along said lines, fifty-five feet to *Dundee lake;* thence (7) southerly along the same to a point," &c., Dundee lake, so called, being a part of the Passaic river, whose waters are widened at that point by the Dundee dam. Such a description carries the title to the *medium filum aquæ*, if the grantor owns so far.

4. A property is also riparian when, in a conveyance of the land, the deed describes the third course as running along the northerly line of Mary Ann Van Saun "to the easterly line of the Passaic river and thence (4) northerly along the easterly line of the Passaic river, the several courses thereof, eight chains and thirty-two links to the place of beginning," the place of beginning being described as "a point in the easterly bank of the Passaic river, where the same is intersected by the division line between William P. Vreeland (the grantor) and Peter H. Doremus," and there being nothing apparent tending to indicate an intention to retain anything, the stream to its centre will be held by legal presumption to be embraced.

*Mr. Chauncey G. Parker,* for the complainants.

*Mr. Edward F. Merrey,* for the defendant.

STEVENS, V. C.

The problem is to ascertain the damages sustained by the various complainants in respect of their riparian lands bordering on the Passaic, by reason of its pollution by the sewage of Paterson. I have already formulated a rule in previous cases (*Doremus* v. *Paterson, 73 N. J. Eq. 476; 81 N. J. Eq. 27; 82 N. J. Eq. 640*), and as it has received the sanction of the court of errors and appeals, I have nothing to do but to apply it to the facts of this case.

I estimate the annual values of such parts of the various properties as are or may be affected by the condition of the river, as follows:

| | |
|---|---|
| Catherine Simmons (house) | $350 |
| Catherine Simmons (ice houses from 1897 to 1905) | 400 |
| From 1905 | 200 |
| John, William and James Hinchliffe | 450 |
| Alexander McDonald Granite Co. (½ of sliding scale), | 300 |
| Mary R. Smith | 400 |
| Leonard Vanderbeck | 450 |
| John Hannema | 300 |
| Jessie Alyea | 300 |
| Peter D. Henderson | 300 |

The above are the improved properties.

I estimate the annual loss arising from what has been called arrested development, as follows:

| | |
|---|---|
| C. Howard Parmley | $25 |
| Doherty Silk Co. (since June 28th, 1909) | 150 |
| Edo Terhune (since his ownership in severalty) | 25 |
| Harold and Irving Terhune (since such ownership) | 15 |
| Rosemont Land and Improvement Co | 50 |

As to the latter of these two classes of cases, I have only to say that an accurate ascertainment of the loss is impossible, and even an approximate estimate only problematical. Many of the considerations that enter into the problem have been adverted to in my former opinions, and as applied to the particular cases here under consideration there are others. Considering the advance of factories up the river from Passaic and down the river from Paterson, and the kind of neighborhood such factories create, the new methods of travel, and the new tastes of the people, I do

not think it possible for anyone to assert, with confidence, what would have been the fate of the lands in question had the water remained unpolluted.

I have made awards to the Doherty Silk Company and to the Rosemont Land and Improvement Company. Lots have been plotted and sold on both tracts, and so it has been argued that the lots are separate pieces of property, and that as far as separated from the river by the old highways, they have become non-riparian. They were, unquestionably, riparian, notwithstanding those highways, when the Rosemont company and Doherty purchased, and I am not satisfied that because they have been plotted on paper and offered for sale they have lost their character as such. The so-called improvements are scarcely discernible on the ground, and the properties seem, still, to be in the stage covered by the decisions of the supreme court in *Somerville and Easton Railroad Co.* v. *Doughty, 22 N. J. Law 495,* and of the court of errors and appeals in *Currie* v. *Waverly Railroad Co., 52 N. J. Law 381, 392.*

It was argued by the city that three of the properties are not riparian in any part, viz., the Henderson, the Hinchliffe and the Hannema properties, because it said that they stop at the edge of the stream.

As to the first, the oral evidence satisfies me that it is riparian. I have no doubt that it was intended to front the Henderson farm on the river, just as all the other farms in that vicinity and around Dundee lake were at one time fronted on the river. It begins "at the Passaic River," which, in legal parlance, means at the *medium filum aquæ,* and, by the course of one chain from the road, it is carried back to the river as it used to flow.

The Hinchliffe property is also riparian. The fifth course in the deed from James Simmons to Margaretta Barney runs

"Thence (5) on the east side of the lake road one hundred and ninety-one feet to the line of lands of Peter P. Kip; thence (6) easterly along said line fifty-five feet to *Dundee lake;* thence (7) southerly along the same to a point," &c.

Dundee lake, so called, is a part of the Passaic river, whose waters are widened at that point by the Dundee dam. By the

great weight of authority such a description carries the title to the *medium filum aquæ*, if the grantor owns so far. In this case it is said that his grantors, John and Janet Bain, in May, 1837, conveyed to the Dundee Company, in fee, a tract of three-quarters of an acre lying in the Passaic river, "overflowed by the raising of the mill dam" of that company. If the last-mentioned lot lay in front of the Barney lot it would not be riparian, according to the cases of *Stevens* v. *Newark and Paterson Railroad Co., 34 N. J. Law 532*, and *Simmons* v. *Paterson, 60 N. J. Eq. 385*. But it lies in front of only a part of it. The plot has been located by the city surveyor of Paterson. From his map it appears that if the side lines of the Barney lot be prolonged to the middle of the stream, or if lines at right angles to the shore line be drawn from the corners of the lot to the middle of the stream, there will still remain a strip of land that belonged to James Simmons and that ran to the *medium filum,* untouched by the Bain deed.

The question whether John and Bankje Hannema are riparian owners may, under the general course of decision, be more doubtful. The deed to them describes the third course as running along the northerly line of Mary Ann Van Saun

"to the easterly line of the Passaic river, and thence (4) northerly along the easterly line of the Passaic river, the several courses thereof, eight chains and thirty-two links to the place of beginning."

The place of beginning is described as

"a point in the easterly bank of the Passaic river, where the same is intersected by the division line between William P. Vreeland (the grantor) and Peter H. Doremus."

I cannot find in the record any testimony which throws light upon the exact location of the beginning point thus mentioned.

To ascertain whether the title extends to the *medium filum,* or to some other line, we have nothing to guide us but the language of the deed itself and the surrounding circumstances. The decisions treat lines running to a stream very much as they treat lines running to a highway. The cases disclose differences of opinion as to the effect to be given to the descriptive words in both classes of cases, some of them attributing more importance

to paramount intention and others giving effect to the ordinary significance of the words used. The cases in our own courts are necessarily of more authority on this question than those of other tribunals. *Salter* v. *Jonas, 39 N. J. Law 469,* is a leading case. There the premises were described as beginning at a stake standing at the junction of the easterly line of Rowland street with the northerly line of Johnson street and running thence *along the northerly line of* Johnson street south, &c.; "thence (3) north 23° 40' west fifty (50) to a stake in *the easterly line* of Rowland street; thence (4) along the same south 66° west one hundred (100) feet," to the beginning. The question was whether Rowland street, in front of the *locus in quo,* to its middle line, passed by this description. Chief-Justice Beasley, speaking for the court of errors and appeals, said: "This is a subject with respect to which the views of judges are much at variance. The general opinion appears to be that there is so strong a presumption of an intention to convey the soil of the highway when the premises granted actually border upon it that very plain indications of a contrary purpose are requisite to exclude it. Under the operation of such a test the present deed would not embrace the land in dispute, for the descriptive words cannot be extended from their intrinsic force, so as to have so wide a reach. The words here used will not, if interpreted in their familiar sense and standing by themselves, admit of being taken as delineatory of any part of the street. The only point for consideration is therefore whether, when the terms used have this restrictive force, they are to lose that force *in the presence of the great presumption to the* contrary, which is inherent in the position of affairs where a lot thus located is granted." He then discusses the Pennsylvania rule, and adopts it, holding that notwithstanding the language of the deed the street passed by the conveyance. He says: "The particular words should in such transactions be controlled and limited by the manifest intention which is unmistakably displayed in the nature of the affair and the situation of the parties. When the conditions of the case are altered, as if the vendor should in a given case have an apparent interest to reserve to himself the parcel of street in question, a different rule of interpretation might become proper."

Now, it would be quite illogical and unnecessary to hold that the situation being similar, there should be one rule in the case of highways and another in the case of streams, if the reason of the rule should apply equally to both. The exception stated by the chief-justice is comprehensive enough to do exact justice between the parties in any case. If the vendor has an apparent interest to reserve to himself what title he has to the street or stream in question, then such reservation should be made. It may be that he may more frequently have such an interest in the case of a stream than in the case of a highway. For example, a mill owner using water power sells a lot on his mill pond running to the "edge" or "bank" or "shore" of the stream. Here the interest is obvious. He needs the uninterrupted flow of the water and it is not likely that he would consciously do that which would tend to endanger it. Hence, many cases have held that in such a situation the words "edge," "shore," "bank" should receive their everyday meaning and so limit the grant. But where there is no apparent reason for making the reservation, and where there are no express words of exclusion, the paramount intent of the parties will, no doubt, be best effectuated by applying the rule laid down in *Salter* v. *Jonas*.

Vice-Chancellor Van Fleet, in *Kanouse* v. *Slockbower, 48 N. J. Eq. 42,* said: "The law is well settled that a grant of land bounded upon or along a river above tidewater carries the title of the grantee to the centre of the stream, if the title of the grantor extends that far, unless the terms of the grant show that is was the intention of the parties that the grantee's title should not extend to that point." And Mr. Justice Dixon, in *Attorney-General* v. *Delaware and Bound Brook Railroad Co., 27 N. J. Eq. 631,* said: "Among these rules, none, I think, is more firmly settled than this, that grants of land bounded upon or along rivers above tidewater carry the exclusive title of the grantee to the centre of the stream, unless the terms of the grant clearly denote the intention to stop at the edge or margin of the river." The precise point here under discussion was not before the court in either of those cases, but the general principle is stated, and, as it seems to me, should, when it comes to its application, be applied in such a way as to harmonize with *Salter* v. *Jonas, supra.*

Coming, then, to the case in hand, I find nothing to exclude the bed of the stream except the vague words, "beginning at a point in the easterly bank of the Passaic," and the further words, "to the easterly line of the Passaic river and thence along the easterly line of the Passaic river the several courses thereof," &c. These words are no 'more indicative of an intention to exclude the stream than were the corresponding words, in *Salter* v. *Jonas,* to exclude the street. In both, "the easterly line" is declared in terms to be boundary. But, looking at the surrounding circumstances, I find no more reason for giving them an exclusive effect in the one case than in the other. The grantor was not a mill owner, or, as far as appears, engaged in a business which required the use of water or power. He conveyed all his front on the stream. He reserved no means of access to it. He did not thereafter claim or use it. The objection comes, not from him, but from the city of Paterson, which has not the slightest interest in the property. Then, again, I think it may fairly be said that if the grantor had really desired to reserve the land over which the water flowed, or any part of it, *i. e.,* the land overflowed by the damming of the stream or that overflowed by the river in its natural state, he would not, by ambiguous description, have conveyed "to the Passaic river the several courses thereof." What did he mean by "river?" Did he thereby intend to retain the river bed and not the artificial lake bed? There is nothing apparent tending to indicate an intention to retain anything. As there are no words of express exclusion, it seems to me that the rule in *Salter* v. *Jonas, supra,* should apply. Thereunder Hannema takes *ad medium filum aquæ.*

I have put the rental value of the Vanderbeck property at $450. This, though it would be warranted by the evidence of Mr. Van Duyne, is, I think, high. The property is, however, by reason of its peculiar situation, more exposed to the odors of the river than any other that I have considered, and the damages are therefore a little greater. By putting the rental value a little higher, proportionately, and by applying to it the sliding scale heretofore formulated, Vanderbeck will receive an award corresponding to his greater injury.

The rental values assigned include, of course, not only the houses, but the barns, outhouses and curtilages attached thereto. If, in any case the rent actually received would, with the damages calculated according to the table, exceed the rental values assigned, the excess should be deducted.