Complainant is the owner of a large tract of land adjoining the Pine Valley golf course near Clementon, in Camden County. This property she inherited from her mother, Virginia E. Ireland. When, in 1885, Mrs. Ireland purchased the major part of the land there existed thereon an ancient artificial body of water known as Large Lake. This lake had been created by the construction of a dam and the impounding of the waters of Timber Creek and thereafter the tract was known as "Bishop's Mill Tract." Gates and a spillway were located at the southerly end of the dam; these gates and a part of the dam were carried away in the September floods of 1940; they have never been replaced; the lake bed is now a marshy basin traversed by two streams.
In February, 1942, a year and a half after the dam had been breached, the defendants Benjamin and Althea Blanchard purchased from one Rita T. Primavera a dwelling and a plot of ground near the northerly end of the dam. One month later they employed the defendant William C. Smith to excavate in the lake bed beside their home, build embankments, and create a reservoir. When the contractor's employees were about to enter upon the lake bed with a power dredge to do this work complainant filed a verified bill for injunction and was granted ad interim restraint. However, *Page 535 
before work was halted by service of the court order a basin 200 feet in length, from 60 to 70 feet in width, and several feet in depth had been dredged; the material removed had been piled farther out on the lake bed. Complainant, advised of this situation, filed a supplemental bill. She prays therein that the defendants be mandatorily directed to restore the lake bed to the condition in which it existed before they excavated therein. The Blanchards admit having prosecuted the dredging operation but claim that, by operation of a presumption of law, they hold fee-simple title to the lake bed where the excavation was made.
The facts essential to a determination of the question before the court are not in dispute. The cause has been fully briefed and has been submitted to the court without objection raised or request made that the question of legal title be settled at law. This court may, then, examine the evidence and determine the question of title. Coast Co. v. Spring Lake, 56 N.J. Eq. 615;36 Atl. Rep. 21; affirmed, 58 N.J. Eq. 586; 47 Atl. Rep. 1131.
The land now owned by Mr. and Mrs. Blanchard was sold by Mrs. Ireland to George Realty Co., September 13th, 1926. George Ulizio, the president of that company, negotiated with Mrs. Ireland for more than two years before persuading her to make the sale. On the land conveyed his company erected the dwelling now occupied by the Blanchards; for several years it was Mr. Ulizio's home. After obtaining the conveyance, Mr. Ulizio continued his negotiations with Mrs. Ireland and, in October, 1927, secured from her an agreement that George Realty Co., its successors or assigns, should have "the right and privilege in default of the maintenance of the said Lake at its present height of water to do and perform any and all acts necessary to maintain the present height of water in said Lake." Mr. Ulizio's testimony is persuasive that, except for this concession, he was never given any control over the lake by Mrs. Ireland and never attempted to exercise any.
At least three inconsistent propositions have been advanced by Mr. and Mrs. Blanchard to justify their dredging work. On the return of the order to show cause, affidavits of Mr. *Page 536 
and Mrs. Blanchard were presented to the court. In those affidavits they said that they were excavating to cause one of the streams in the lake bed to run closer to their property and thus to provide a water reservoir; that the material removed was being deposited on the lake bed to eventually form an island which they would beautify with transplanted flowers and shrubbery; and, that they were doing all of this by permission of the complainant. Restraint was continued pendente lite and the Blanchards filed an answer and a counter-claim. Therein they declared that they were creating in the bed of the lake, not an island but a reservoir embankment, and that they were entitled to construct it under the written agreement of October 7th, 1927, between Mrs. Ireland and George Realty Co., and an oral agreement they had made with the complainant. Also, and for the first time in this cause, they raised the contention that they owned a part of the lake bed.
On final hearing the evidence did not support the contention of the defendants that complainant had orally agreed to permit them to make changes in the lake bed nor did it support their suggestion that the work they did was done under authority of the supplemental agreement of 1927 to restore and maintain the "height of water in said Lake" as of the date of that instrument. It is undoubtedly true that the defendants first planned to rebuild the breached dam and restore the lake to its former water level for they obtained an estimate of the cost. It was high and they then besought complainant to agree to convey certain land to them to reimburse them if they did the work. It was apparently complainant's rejection of this proposal which persuaded them to adopt a different project and a different theory to justify their entry upon the lake bed. They now cite Fowler v. Vreeland
(Court of Errors and Appeals), 44 N.J. Eq. 268;14 Atl. Rep. 116; Salter v. Jonas (Court of Errors and Appeals),39 N.J. Law 469; Kanouse v. Slockbower (Court of Chancery), 48 N.J. Eq. 42; 21 Atl. Rep. 197, and Simmons v. City of Paterson
(Court of Chancery), 84 N.J. Eq. 23; 94 Atl. Rep. 421, and contend that the presumption of law indulged by our courts in those decisions must be applied *Page 537 
here and must result in a determination that they own the lake bed beside their home.
Salter v. Jonas, supra, concerned the construction to be put upon a conveyance of land bounded upon a public highway. Our Court of Errors and Appeals said: "Under ordinary circumstances, the thread of land constituting the street is of great value to the contiguous lots, and it is of no value separated from them. It would rarely occur that a vendee of a city lot would be willing to take it separated in ownership from the street, and it would as rarely occur that a vendor would desire to make such severance." Having so assumed, the court held that, in a conveyance of lands abutting upon a street or highway, nothing short of express words of exclusion would prevent the title from extending to the medium filum of such street or highway, the grantor, at the date of such conveyance, being the owner of such street or highway to that extent.
In Paterson v. East Jersey Water Co., 74 N.J. Eq. 49;70 Atl. Rep. 472; affirmed, per curiam, 77 N.J. Eq. 588;78 Atl. Rep. 1134, Vice-Chancellor Emery held that when a river is mentioned as a boundary in a conveyance "it requires express words to restrict the conveyance to the side of the river." And, in Simmons v. City of Paterson, supra, Vice-Chancellor Stevens applied the same presumption in construing a conveyance of land running to an artificial lake. However, the Vice-Chancellor commented: "If the vendor has an apparent interest to reserve to himself what title he has to the street or stream in question, then such reservation should be made. It may be that he may more frequently have such an interest in the case of a stream than in the case of a highway. For example, a mill owner using water power sells a lot on his mill pond running to the `edge' or `bank' or `shore' of the stream. Here the interest is obvious. He needs the uninterrupted flow of the water and it is not likely that he would consciously do that which would tend to endanger it. Hence, many cases have held that in such a situation the words `edge,' `shore,' `bank' should receive their everyday meaning and so limit the grant." In Salter v. Jonas,supra, Chief-Justice Beasley said: "The particular words should, *Page 538 
in such transactions, be controlled and limited by the manifest intention which is unmistakably displayed in the nature of the affair and the situation of the parties. When the conditions of the case are altered, as if the vendor should, in a given case, have an apparent interest to reserve to himself the parcel of street in question, a different rule of interpretation might become proper."
The defendants are uncertain as to the portion of the lake bed they should claim. In their amended counter-claim they assert ownership "to the middle of the lake;" in their original counter-claim, to "the lands extending to the middle of the former lake or of the streams feeding the same." This indefiniteness is understandable. In some of the early cases concerning grants of land bounded upon artificial ponds or lakes it was suggested that the grantor would assumably have conveyed land to the middle thread of the stream if he owned so far and it had not been dammed and, therefore, it would be presumed, in the absence of a contrary intent expressed in the deed or reasonably inferable therefrom, that he intended the conveyance to pass land to that line. It has also been said that the grant should be presumed to have been intended to extend to the thread of the stream dammed only if that thread was thereafter always apparent in the pond or lake. Many courts, however, have failed to discriminate between the thread or middle line of the river or stream dammed and the middle line or the center of the pond or lake created. Consequently it has been variously presumed (a) that the parties intended such a grant to carry to the middle thread or line of the former river or stream, (b) that they intended a grant running to the middle line of the pond or lake, and (c) that they intended a grant to the center of the pond or lake. Waterman v. Johnson, 13 Pick. 261, 265. See, also,Angell on Waters, § 44; 4 R.C.L. 96; 8 Am. Jur., Boundaries, §§16, 17. The point is unimportant in this case for, irrespective of the confusion and of distinctions made and ignored, the question whether, under a conveyance of land bounded by a body of water, submerged land will pass, has been generally and justly held to be controlled by the intention of the parties as expressed in the deed, construed in the *Page 539 
light of the surrounding circumstances and the situation of the parties. Salter v. Jonas, supra (at p. 473); Simmons v.City of Paterson, supra (at p. 28); Kanouse v. Slockbower,supra (at p. 49); Fowler v. Vreeland, supra (at pp. 271,272); Soper v. Conly, 108 N.J. Eq. 370; 154 Atl. Rep. 852;affirmed, 107 N.J. Eq. 537; 153 Atl. Rep. 586.
It is quite obvious that the dam in question was not built through a swamp and a lake created without a definite object. The evidence indicates the same activating purpose which prompted the creation of most of the artificial ponds and lakes in southern New Jersey — to provide power for the operation of a mill: The deed to Mrs. Ireland states that prior to 1885 the tract was known as "Bishop's Mill Tract" and the private road running over the dam was called "Mill Road." Two branches of Timber Creek were blocked by the dam, one at its southerly end and one at its northerly end. The gates and spillway were located at the southerly end and, before or during the occupancy of the property by Mrs. Ireland, a flume was inserted at the northerly end of the dam. It also appears from the deed of Mrs. Ireland to George Realty Co. that shortly before its execution she had constructed a retaining wall with masonry wings at the lake end of the flume. Mrs. Ireland used the flow of water from the flume to operate a small sawmill and to generate electric power to service her home and property.
Without the necessity of recourse to the testimony of Mr. Ulizio that he had sought and Mrs. Ireland had refused to give a conveyance of land running to the middle of the lake, tentatively received over objection, I am convinced by the evidence that the parties to the conveyance did not intend the description therein to include any part of the land under the lake, and that the words chosen and employed in the deed did in fact restrict the grant to the then high water mark of the lake. A limitation of the grant by Mrs. Ireland to upland was most natural in view of her situation and her use of the lake. She owned the entire lake and all of the land surrounding it; she owned the dam and the swamp land below the dam; her home was near the lake and she and her guests used the lake for recreational purposes; she owned the private *Page 540 
road which crossed the dam; she, or a predecessor in possession, had inserted the flume in the dam and she had "recently erected" the new retaining wall and improved the road; and, she was operating or had operated a power plant erected at the lower end of the flume.
Before the deed was prepared several "maps" were made of the location and Mr. William S. Casselman, of the title company, was brought by Mrs. Ireland to the location and consulted relative to the conveyance; it was determined to use the survey and blue print of Mr. Rightmire which is in evidence, and the deed was drawn in conformity therewith. Two tracts of land were conveyed, one beside the lake and to the east of Mill Road, the other below the dam and to the west of Mill Road. They were separately described. In each description there was a water boundary. The description of the land below the dam contains these words: "extending thence Westward along the middle of said branch of said Creek," c. The description of the land above the dam contains these words: "to the edge of the lake at the present height of the water of said lake thence in a Westerly direction along the edge of the lake," c. Why, in the latter description did Mrs. Ireland not use the word "middle" as she used it in the first description if she intended to convey to the middle of one or the other of the branches of Timber Creek or to the middle of the lake? If it were not the intention of Mrs. Ireland to limit her grant to upland, why did she choose and employ the words "at the present height of the water in said lake?" This was not an indefinite conveyance of land running to or along a lake, but a grant to a line fixed at that time in fact and by survey. Furthermore, the two tracts of land conveyed were separated by Mrs. Ireland's private road which she had "recently" improved to a width of forty feet. Naturally one would anticipate that she would wish to retain full ownership and control of this road. It led into and through her property and also provided an entrance to the Pine Valley Golf Club. In neither description does her grant extend to the "middle" of the private road; in each description the boundary runs along a side line of the road. *Page 541 
Further indicia of an intention to limit the lands conveyed to the definite lines laid down on the blueprint and followed in the deed are obvious in that instrument. The then high water mark of the lake was further fixed as a definite boundary by the addition in the description of the approximate compass course. The course was also made to run to the "Easterly end of the Northerly wing of the abutment along said pond thence Southwestward along said abutment to the place of beginning." Thus, both ends of the course were fixed. The deed states the quantity of land conveyed: The grant was said to contain seven and a half acres; that was the quantity of land designated on the blueprint as contained within the boundary lines there laid down.
No reason has been suggested why Mrs. Ireland would be willing to destroy the value of her lake property by the conveyance of a portion thereof directly in front of the flume and of the wall she had "recently" built. It may be logically said that one could reasonably expect no future benefit from the retention of the fee in half of a public highway, or, to a lesser degree, in half of a stream, but in the instant case so long as the lake existed the owner possessed valuable rights and privileges. It would be absurd, in the face of all this evidence of an intention to limit the lands conveyed to the definite lines laid down on the blueprint and followed in the deed, to assume that Mrs. Ireland intended to convey land to the center of the lake or to the middle line of one of the streams.
In actions involving a disputed boundary line, acts and conduct of the parties with regard to that line may be shown, as may the contemporaneous construction by the interested parties of the location of the line. Proof of the establishment or recognition of the boundary line intended by the deed or the interpretation of a grant by the grantees is admissible. 11 C.J.S., Boundaries,¶ 109; cases collected in Key 48, Boundaries, Atlantic Digest;Keilt v. Lozier (Supreme Court), 7 N.J. Mis. R. 642;146 Atl. Rep. 786.
As a part of their case, the defendants introduced into evidence the instrument dated October 7th, 1927, conferring upon George Realty Co., its successors and assigns "the right *Page 542 
and privilege in default of the maintenance of said lake at its present height of water to do and perform any and all acts necessary to maintain the present height of water in said Lake." Their case is not aided by this instrument. There is implicit in it a recognition by George Realty Co. that it had not purchased any part of the lake bottom and that it had no right to control any part of the lake. In it George Realty Co. acknowledged the "right" of Mrs. Ireland to control the waters of the lake and agreed that, for the concession it was securing, Mrs. Ireland might, if she chose, flood part of its upland. Mrs. Ireland's deed, accepted by George Realty Co. stipulated that the privilege granted "shall not be construed to prevent or interfere with theright of the said party of the first part her heirs and assigns to maintain or raise the water in said Lake not to exceed three feet above the present height of water in said Lake." (Italics mine.) Here Mrs. Ireland again fixed the high water mark as the dividing line between the water she controlled and the upland she had sold, and again the grantee accepted such definition. Not only this, but the instrument recites that the lands originally conveyed were "as specifically described in said deed which said lands and premises are adjacent to a lake or body of water," c. (Italics mine.) "As specifically described in said deed," the land conveyed was all above the then height of the water in the lake. The word "adjacent" signifies near to or in the vicinity of, and not necessarily touching or bordering upon.2 Words and Phrases 379.
When the Blanchards purchased their present home they did so with knowledge of existing conditions. The dam was broken and there was no lake. They would not, however, be forced to live at the dead-end of a road and beside a marshy lake bed, for with their purchase they obtained the right to rebuild the dam (at their own expense) and to restore the lake to its previous high water mark. Their actions must speak for them; they did not offer themselves as witnesses on final hearing. There can be no doubt but that, during the time the Blanchards were negotiating with complainant, they were acting upon their right to restore the lake to its former level under the supplemental agreement, although *Page 543 
they were also attempting to exact compensation from the complainant not called for in the instrument. It is not suggested that they then made any claim to ownership of any part of the lake bed. Nor, when they presented their affidavits in an effort to have the restraint imposed upon them removed, did they assert any ownership in the land where they had been excavating; they even suggested, at that time, that the mud which was being dredged and piled out in the lake bed would later be used in part to restore the dam. It was not until the Blanchards filed their answer that they claimed ownership to a part of the lake bed.
The evidence is convincing that the intention of the parties to the deed before the court was not to convey any lands then covered by the waters of the lake, and the instrument, read in the light of proven circumstances preceding and surrounding its execution, and the situation of the parties, must be construed as excluding all such lands. So finding, I shall advise the issuance of an injunction mandatorily directing the defendants to restore the land of the complainant to the condition in which it existed as of the time of their entry thereon and excavating therein. This finding also resolves the ownership of the lake bed; complainant owns the land in fee to the height of the water as of September 13th, 1926.