## SCHUMM *vs.* SEYMOUR and others.

1. Municipal authorities, in the making of street improvements, authorized by law to be made at the expense of the owners of lands to be benefited thereby, are, to a certain extent, the agents of such owners. Contracts lawfully made, at the discretion of the authorities, are binding upon the land owners, though injudiciously made, but the owners are entitled to have such contracts performed substantially, in all things, according to their terms, and the authorities have no power to dispense with such performance, to the gain of the contractor and the loss of the property owners.

2. If official authorities are about to accept and pay, under a contract, for what, in substantial and important respects, is not according to the contract, so that the difference enures to the benefit of the contractor, at the expense of the owners, the authorities, in so doing, are guilty of a breach of trust which amounts to a fraud. The proper and only remedy, in such case, is in equity.

3. If the land owners stand by and see the officials pay the contractor they can have no relief against the assessment. But a court of equity' will enjoin such wrongful payments, and in so doing, does not interfere with the exercise, by municipal corporations, of the legislative or discretionary powers conferred by their charters.

4. In the exercise of the legislative or discretionary powers conferred upon municipal corporations by their charters, they are beyond the control of the courts; but after such powers have been exercised, and the authorities are about fulfilling a contract for street improvements, by paying for its performance with the money of the lot owners, they are not acting in a legislative capacity, but in the capacity of agents, amenable to the courts.

5. Where a contract made by street commissioners, under chartered authority, requires that paving shall be done in accordance with specifications, but the work is not so done, and the departure from the contract results in a large saving to the contractor, the payment of the stipulated price will be restrained, even though the substituted work be equally good with what the contract required.

6. The affairs of a corporate body can be transacted only at a corporate meeting. Its legislative and discretionary powers can be exercised only by the coming together of the members who compose it; and its purposes or will can be expressed only by a vote embodied in some distinct and definite form. Their only existence is as a board, and they can do no valid act except as a board, and such act must be by ordinance or resolution, or something equivalent thereto.

7. Under a charter investing commisioners with powers over street improvements, and expressly enacting that no work or materials for the improvement of streets shall be contracted for, unless specifications therefor, and proposals for doing such specified work, or furnishing such specified materials, have been fully advertised, a property owner cannot be assessed for any part of the cost of work and materials furnished upon the order of individual commissioners, and without any bargain as to price or other particulars between the commissioners, in their lawful capacity, and the contractor, and without advertisements or competitive bids.

8. Public policy requires such restrictive enactments to be rigidly enforced, and the consequences resulting from the void character of the contracts they prohibit, must be the same in equity as at law.

9. It is a general and fundamental principle of law, that all persons contracting with a municipal corporation must, at their peril, inquire into the power of the corporation, or its officers, to make the contract. And a contract beyond the scope of the corporate powers is void.

10. Where municipal officers exercise powers not conferred by charter, in the making of street improvements, they are, in no sense, agents or representatives of property owners, and no liability attaches to the latter, from mere inaction or silence, for improvements so made. The doctrine of equitable estoppel has no place in a case where usurped powers have been exercised by municipal officers, who, in so doing, were contravening public policy, as well as known positive law.

11. Where officials are acting within the terms of their delegated powers, though they may be acting carelessly, negligently, or in culpable betrayal of their trust, they are the agents of those whose property is liable to be charged; and if the latter acquiesce in, or fail to interpose when the negligent or culpable conduct of their agents is open to their view, they will not afterwards be allowed to set it up, when the effect of so doing will be to subject innocent parties to the burden that would otherwise fall upon themselves.

*Mr. S. C. Mount,* for complainant.

*Mr. Leon Abbett,* for defendants.

THE VICE-CHANCELLOR.

This suit is against the street commissioners of Greenville, together with the contractor, whom the commissioners employed to do work and furnish materials for the improvement of a street in said township, called the New Bergen Road. The complainant is an owner of land on the line of

Schumm v. Seymour.

the road, and because liable to a special assessment for the expense of the improvement, has exhibited his bill, as well for himself as for all others similarly interested who may come in. He asks relief on the ground that the improvement has been imperfectly and illegally made.

At the filing of the bill, in September, 1872, the work in question was alleged, by the defendants, to be substantially completed, and about four-fifths of the total sum claimed by the contractor for the whole, had been paid. A temporary injunction was issued, restraining the commissioners from further payments, and from levying any assessment for the moneys which the contractor had already received. The defendants have answered, and the cause has been argued, upon the pleadings and proofs.

By an act of March 27th, 1868, supplemental to the township act of Greenville, five persons were appointed commissioners, to complete a map of said township, with reference chiefly to streets, and by a further supplement of March 9th, 1869, were constituted "Street Commissioners of Greenville." The powers conferred upon them are unusually large. They are authorized to sue and be sued, by their corporate title, to issue township bonds, or certificates of debt, and contracts made by and judgments recovered against them, pursuant to their powers, are of like effect as if made by or recovered against the inhabitants of the township. They are exclusively authorized to lay out, open, and regulate public avenues and streets, and may, at their discretion, improve any streets or avenues, by any method, including paving, curbing, and guttering, and with any kind of material, and may make sidewalks, of plank, or other material, and build drains and sewers in any streets, or any parts of them. The expenses thereby incurred are to be assessed by three persons, appointed by the commissioners, said persons to determine and report to the commissioners, what real estate ought to be assessed, and what proportion to each lot.

By the eighteenth section of the act of 1869, all contracts for work, or materials, are to be given to the lowest bidder,

complying with the requirements prescribed by the commissioners, upon giving adequate security for the performance of the contract. It is further provided, that "no work or materials shall be contracted for, unless specifications therefor, and proposals for doing such specified work, or furnishing such specified materials, have been fully advertised by the commissioners, both by posting in five public places in the township, and by notice in a newspaper circulated therein."

The street in question, in this suit, is about a mile and one-third in length, beginning, on the north, at the late southerly line of Jersey City, and running thence south, in Greenville, to the Morris Canal. Proposals for work and materials were advertised by the commissioners, and bids received in pursuance of them, on the 6th of September, 1871. The street was to be graded, its sidewalks curbed and flagged, and the road-bed covered with McAdam. The contract was awarded to James H. Elmendorf, a defendant in the suit. Payments were agreed to be made, upon the estimates of the engineer, as the work went on, and the balance, certified by the engineer to be due, was to be paid when the work should be completed and accepted. The final certificate of the engineer was made on the 29th of October, 1872, when the whole improvement is said by the defendants to have been fully completed. By this certificate, the total cost of the improvement is shown to be $124,708.68; of which $104,434.88 is certified to have been previously paid, leaving a balance of $20,273.80 then due.

Included in this total cost, are certain materials and work, not specified in the proposals or bids, or in the contract pursuant to them, but subsequently ordered by the commissioners, during the progress of the contract work. Both portions of the total work and materials, that is to say, the portion included in the proposals and bids, and the portion not included, are matters of dispute in the cause. In respect to the first, the complainant insists that they are not in substantial fulfillment of the contract, and that large deductions should therefore be made from the certified cost. In respect

to the second, he insists that the commissioners had no lawful authority to procure them at all; that their subsequent contract for such work and materials was illegal and void, because entered into without previous proposals and bids, as required by the act, and that for this reason, the amount of the certified cost of them should be wholly disallowed.

First: as to that portion included in the proposals and bids. The principles on which it must be disposed of, are well settled in this state, and in others, and were clearly stated by Chancellor Zabriskie, in the case of *Bond* v. *The City of Newark*, 4 *C. E. Green* 376. Municipal authorities, in the making of street improvements, authorized by law to be made at the expense of the owners of land to be benefited thereby, are, to a certain extent, the agents of such owners. Contracts lawfully made, at the discretion of the authorities, are binding upon the land owners, though injudiciously made; but the owners are entitled to have such contracts performed, substantially, in all things, according to their terms, and the authorities have no power to dispense with such performance, to the gain of the contractor, and the loss of the property owners. If official authorities are about to accept and pay, under a contract, for what, in substantial and important respects, is not according to the contract, so that the difference enures to the benefit of the contractor, at the expense of the owners, the authorities, in so doing, are sacrificing the interests of those for whom they are acting, and are guilty of a breach of trust, which amounts to a fraud. The proper and only remedy in such case, is in equity. If the land owners stand by, and see the officials pay the contractor, they can have no relief against the assessment. Courts of equity will enjoin such wrongful payments, and in so doing, do not interfere with the exercise, by municipal corporations, of the legislative or discretionary powers conferred by their charters. In the exercise of such powers, they are beyond the control of the courts; but after such powers have been exerted, and the authorities are about fulfilling a contract, by paying for its performance, with the

money of the lot owners, they are not acting in a legislative capacity, but in the capacity of agents amenable to the courts.

In the case of Bond v. The City of Newark, the preliminary injunction was granted in 1863, by Chancellor Green, and was brought to a final hearing and decision, before the late Chancellor, in 1869. The street which had been worked, under the contract, in that case, had then been for years in public use, and it was deemed inequitable to compel the contractor to put his work in such condition as the contract required. It was referred to a master, to ascertain and report what additional cost the contractor would have been at, if he had substantially and fully complied with every express requisition of his contract; and in so doing, the master was to have no regard to the question, whether the work, if so performed, would have been materially better than the work as actually done.

In the present case, the street, as worked, has been in use ever since the alleged completion of it, and the proper inquiry, therefore, is, whether any substantial departures from the contract took place, by virtue of which a deduction ought to be made from the amount of the certified cost.

Several such departures are alleged, the first of which is in the construction of the road-bed. By the proposals and contract, the road was to be McAdamized from curb to curb, as follows: After the road-bed has been brought to the proper grade or surface to receive the McAdam, the contractor will be required to cover the same with broken stone, to the depth of six inches, placing the same with regularity, so as to preserve an even surface; when so placed, to be thoroughly rolled, with a roller weighing not less than five tons. He will then cover the same with earth, two inches deep, which must likewise be rolled; the whole must then be covered with clean, coarse gravel, six inches deep, and thoroughly sprinkled and rolled, in accordance with the directions of the engineer.

A great deal of the evidence relates to this part of the

contract: as to whether the broken stone was, in fact, six inches deep, and properly laid; as to whether it was sufficiently rolled, and as to the proper nature and depth of the earth and gravel with which the stone foundation was required to be covered. Numerous witnesses were examined on both sides, and their testimony as to some of the important particulars, is variant and contradictory; but upon one point no conflict exists. It is admitted that, when the stone was laid down, it was not rolled before being covered with earth. The reason assigned is, that it was impassable for horses, the rough character and uneven surface of the stone preventing them from passing over it. The testimony shows that the broken stone, so called, consisted of spralls or slips from the quarry, of cobble stones and boulders, varying in size from six inches to a foot or more in length, and of varying thickness and shape. These stone were laid down by hand, and are claimed to have been six inches deep. But spaces between them necessarily existed, by which the depth, when attempted now to be ascertained by measurement, must obviously vary, and by this fact the contradictory statements of witnesses in regard to the depth may be well enough explained. The defendants admit that the stone, as laid down, could not have been advantageously rolled, because their size and shape were such that the pressure of a roller five tons in weight would have unequally and injuriously affected them, pressing some into the earth, others upon their sides, and leaving the whole foundation uneven. On account of these difficulties, the stone were first covered with earth two or three inches thick, and then rolled; and the defendants allege that, by this rolling, the interstices were filled up, the stone kept in position and braced, regularity of surface preserved, and a road-bed secured as good and durable, at the least, as if the terms of the contract had been complied with. I am of opinion that this view of the matter is altogether inadmissible to justify a departure from the contract, and entitle the contractor to the stipulated price. I think it plain, from the evidence, and from the nature of the work, that this

departure was a large saving to the contractor; and on this ground, admitting the substituted work to have been equally good with what the contract required—an admission, however, that cannot be true—still, the commissioners, in paying him, as they propose to do, the full contract price of the work, would be wasting the money of their constituents, and would be guilty, in the eye of the law, of a fraud. That the amount of saving to the contractor, from this departure, would be considerable, is easy to be seen. The road being about a mile and one-third in length, and thirty feet wide between the curbs, presents a surface for the McAdam of about twenty-seven thousand square yards. This is the number specified in the contract. The price is $2 per square yard, making the cost of the McAdam alone, more than half the cost of the whole original improvement. By the departure, the expense of breaking the stone over the whole of this surface, and of rolling it, when broken, was saved. The defendants insist that the stone, as furnished, was broken stone, within the meaning of the contract, and that only the cost of rolling was saved. But the contrary of this is clearly the truth. The stone was to be so broken as to be capable of being placed with regularity, of presenting an even surface, and this for the very purpose of being rolled with the weight of five tons. The character of the broken stone required is determined by what was to be done on it, and there can be no doubt that the road-bed, if so made, would have been materially better. My opinion is, that the variation from the contract, in this particular, was a substantial one in the interest of the contractor, and against the interest of the property owners, and that the contractor is not entitled to be paid for it at the rate of $2 per square yard.

Departures from the contract specifications are also alleged to have been made in the flagging, the bridge stone and the curbing. It is also charged that the road was not graded and the excavations filled in, as the specifications require; that the sand filling, allowed for in the final certificate, was not in fact furnished, and that the covering of six inches, to be put on

the top of the road bed, was not clear, coarse gravel of such quality as the contract requires.

The flagging was to be laid in a course four feet wide; no stone to be less than two inches thick, or contain less that eight superficial feet, and every fourth stone to contain twelve superficial feet. The bridge stone were to be not less than four feet long, two feet wide, and six inches thick. The curbing to be not less than four feet long, twenty inches wide, and four inches thick.

The proofs show that these three classes of stone, as furnished by the contractor, are not up to the above requisitions. To a large and important extent, they are of less dimensions, and the evidence on the part of the defendants tending to show that the difference in dimensions is such as often occurs, will not avail to show that they are in substantial fulfillment of the contract. About 15,000 lineal feet of curb stone are called for by the contract, to be not less than four feet long, twenty inches wide, and four inches thick. It is admitted that these were not in fact furnished. More than 11,000 feet are admitted to be only sixteen inches wide, and in other measurements correspondingly deficient. In the early part of the work, the contract requirements in respect to the curb appear to have been waived, and though nothing was then agreed on, as a reduction of the price, eight cents per lineal foot has been deducted on the final certificate. It is not clear in my view, on what legal basis this charge as reduced can be supported at all, but I am satisfied, if a legal item, it must be still further reduced.

Sand filling for the laying down of the flagging and bridge stone, was contracted to be furnished at $1.50 a cubic yard. The specifications call for about nine hundred cubic yards. This was the approximate amount needed for the whole flagging and bridge stone, if laid down as required. It appears from the proofs, that in point of fact, the stone were laid for the most part upon the sand or sandy loam of the side walks, or streets, by simply spading it up. The sand was in no sense filled in by the contractor, as was evi-

dently contemplated, and as the specifications evidently assumed would be necessary, but if sand at all, was sand already there and already filled in. The quantity of sand filling allowed by the final certificate is, nevertheless, 1160 cubic yards. It is difficult to suppose that this item would have been allowed by the commissioners, or even claimed by the contractor, if the commissioners had been the parties at whose exclusive personal expense the work was being done. My opinion is, that in the five several particulars mentioned above, deductions must be made from the sums allowed in the final certificate.

Second: as to that portion of the improvement not included in the proposals and bids. It is made up as follows: Forty stone and cement basins, $2000; three thousand square yards extra broken stone, averaging one foot in depth, $6000; two hundred and seventy-seven and fourteen hundredths cubic yards of stone, in blind drains, $1110.96; eight hundred and sixty-nine lineal feet wooden box drains, $608.30; eight hundred and eighty-eight feet of gutter stone, $310.80; one hundred and eighty-nine and ninety-seven hundredths cubic yards of rock excavation, $949.85; making a total of $10,979.91.

The work and materials in these several items appear to have been bargained for, or directed to be furnished, at different times, by some of the individual commissioners, or by the engineer acting for them. No action respecting them was taken by the commissioners, as a collective or corporate body. There was no written or definite bargain as to price or other particulars, between the commissioners, in their lawful capacity, on the one side, and the contractor on the other, and no advertisements or competitive bids. As a necessary consequence of this absence of any contract by the commissioners, either directly or through an authorized agent, this part of the alleged improvement is altogether without authority of law, and I can discover no grounds on which any part of the cost of it can be assessed upon the lands of the complainant.

The affairs of a corporate body can be transacted only at a corporate meeting. Its legislative and discretionary powers can be exercised only by the coming together of the members who compose it, and its purposes or will can be expressed only by a vote embodied in some distinct and definite form. As was said of the mayor and common council in *Dey* v. *Jersey City,* 4 *C. E. Green* 412, their only existence is as a board, and they can do no valid act except as a board, and such act must be by ordinance or resolution, or something equivalent thereto.

A resolution is shown to have been regularly passed, directing the execution of the original contract, according to the bids, but all the work and materials now in question, appear to have been ordered by no person lawfully empowered to do so by the commissioners as a corporate body.

But if ordered by the commissioners as a corporate body, I think it equally clear that their action was in open and direct contravention of the charter by which the corporate body was created, and its powers and duties prescribed. As before stated, that charter expressly enacts that no work or materials for the improvement of streets shall be contracted for, unless specifications therefor, and proposals for doing such specified work, or furnishing such specified materials, have been fully advertised. This enactment is the chief, if not the only limitation of the extraordinary powers for the improvement of streets, with which the commissioners were clothed. It cannot be regarded as directory, or as anything less than a positive peremptory restriction of power. Unless in pursuance of its terms, a contract for material or work is utterly void. Upon authority and principle, there can be no other conclusion. A different construction would give unrestrained license to the collusive and fraudulent practices which this provision is designed to prevent. Public policy requires such restrictive enactments to be rigidly enforced, and the consequences resulting from the void character of the contracts they prohibit, must be the same in equity as at law. There was nothing in the circumstances or condition of the

street, to render it impracticable or difficult for the commissioners to make the advertisement required. No necessity for immediate action can be said to have arisen, and their conduct in disregarding the plain letter and spirit of the law, must be regarded as an indefensible assumption of power.

It is scarcely necessary to observe, says Dillon, *Municipal Corporations*, § 372, that no contract can be made by a corporation, which is prohibited by its charter, or by the statute law of the state. And it is a general and fundamental principle of law, that all persons contracting with a municipal corporation must, at their peril, inquire into the power of the corporation, or its officers, to make the contract; and a contract beyond the scope of the corporate powers is void. This is certainly so in all cases where this authority is special, and of record, or conferred by statute. The numerous authorities referred to by that writer, establish, beyond question, the doctrine thus stated. This doctrine is said, in section 381 of the same text book, to grow out of the nature of such institutions, and to rest upon reasonable and solid grounds. Their duties and powers are prescribed by statute or charter, which all persons, not only may know, but are bound to know. The opposite doctrine would be fraught with such danger, and accompanied with such abuse, that it would soon end in the ruin of municipalities, or be legislatively overthrown.

In the present case, it was urged, on behalf of the defendants, that the complainant, and others similarly interested, cannot be permitted, in equity, to avail themselves of the illegality of the contract, after permitting the improvement to go on and receiving its benefits. The doctrine of equitable estoppel is a familiar one, and of frequent application, but it has no place in transactions like the present, where usurped powers have been exercised by municipal officers, who, in so doing, were contravening public policy, as well as known positive law. There can be no pretence of ignorance, or accident, or mistake, or of having been misled by the party to whom the alleged benefit would accrue. In their illegal assumption of power, they were, in no sense, agents or repre-

sentatives of property owners, and no liability attached to the latter from mere inaction or silence.

The effect, in equity, of the violation or disregard, by municipal authorities, of statutory conditions and limitations, is exhibited in *Brewster* v. *City of Newark*, 3 *Stockt.* 114. In that case, the street in front of the complainant's land had been guttered and paved under an ordinance of the city, and a sale of the land for non-payment, by complainant, of the amount of his assessment for benefits, was enjoined by Chancellor Williamson, on the ground that the complainant was entitled, by the charter, to be notified that the guttering and paving were required to be done, and to have the same done at his own direction and expense. The city did the work, and the complainant looked on, but no equitable estoppel arose from his inaction or silence, notwithstanding the special benefit received. It was held that the city could acquire no lien upon his property for doing the work. In that case, the power was conditioned on previous demand and notice. In this case, it is conditioned on public advertisements and bids. In both cases, the reason and object of the enactments are the same, and of indispensable importance. They will be enforced in equity, equally as at law.

The case is different where officials are acting within the terms of their delegated powers, though they may be acting carelessly, negligently, or in culpable betrayal of their trust. They are then the agents of those whose property is liable to be charged, and if the latter acquiesce in, or fail to interpose when the negligent or culpable conduct of their agents is open to their view, they may not afterwards be allowed to set it up, when the effect of so doing will be to subject innocent parties to the burden that would otherwise fall upon themselves. This principal was enunciated and applied by the Court of Errors in *The State* v. *Jersey City*, 5 *Dutcher* 441. It was said by Chancellor Green, in that case, that no misconstruction or malconstruction of the work, arising from the incapacity, the honest mistake, or the fraud of the contractor, would invalidate the assessment or relieve the party assessed

from the obligation to pay it.   In this respect, the property owners, assessed for the cost of a sewer, must stand upon the same footing with parties assessed for taxes for public benefit.

In cases like the present, where public moneys have been paid out, or public obligations been issued for the whole or a part of the work, the burden of such payments must fall upon the tax payers at large, if property owners are permitted to escape from special assessments.   As against the tax payers at large, such owners must suffer the loss resulting from the incapacity or breach of trust of their agents.   This is the reason why, if the municipal authorities are about wrongfully to pay the contractor, the only adequate remedy for the owners is in equity.   *Bond* v. *Newark*, 4 *C. E. Green* 385.

The disposition to be made of the case, in accordance with the foregoing views, is this :   The sum of $10,979.91, certified as the cost of the extra and illegal work, must be disallowed and its payment enjoined.   The remaining balance unpaid, is $9293.89.   The payment of it must be enjoined till proper deductions have been made from the sums certified to be due for sand filling, for McAdam, for bridge stone, for flagging, and for curbing.   The evidence has left me in doubt, whether other parts of the work were in substantial compliance or not with the terms of the contract.   The charge of collusion between the contractor and commissioners, made in the bill, and endeavored to be proved, has not been established.   But the lax conduct of the commissioners in the management of the work, and their readiness to pay for what was inadequately done, or not done at all, are well fitted to engender suspicion.   They amount to legal, if not actual fraud.   Following, however, the rule, that the departures from the contract must be clearly substantial, and clearly proved, my conclusion is that the deductions should be limited to the items I have named.   From the evidence as it stands, no sufficient data exists from which the deduction for not properly breaking, placing, and rolling the stone for the McAdam, can be computed.   A reference must be had to

Schumm *v.* Seymour.

ascertain this amount, and additional proofs may then be taken, if either party desires it, upon the other items from which deductions are directed to be made. The difference between the certified cost of work and materials, and their fair cost, must be the measure of the respective deductions.

I respectfully advise a decree as above.