This bill is filed by four citizens and taxpayers of the township of Lakewood, Ocean county, New Jersey, one of whom, Dr. MacMillan, was at the time of the filing of the bill a member of the township committee of that township, and one of whom, Thomas J. Buchanan, died between the date of the filing of the bill and the final hearing. The defendants are James F. Conly, Adam Finlay, Clayton C. Hurley, John H. Myers, the other members of the township committee on the date of the filing of the bill, the township committee of the township of Lakewood, and the Lakewood Hotel and Land Association. The bill seeks to enjoin the execution and performance of a proposed contract between the township of Lakewood and the Lakewood Hotel and Land Association, which was authorized by resolution of the township committee and which contract provided for the purchase by the township from the land association of property in that township consisting of Lake Carasaljo and certain lands surrounding the lake for the sum of $200,000, with allowances to the township for surveys, title searches and incidental expenses not exceeding $10,000, on the ground that such an expenditure by the township would be an unlawful diversion of public funds by the township committee and a fraud on the taxpayers. The gravamen of the bill is set forth in the seventeenth, eighteenth and nineteenth paragraphs thereof and may be summarized as follows: *Page 373 
"17. That the agreement for the purchase of the property was entered into by the members of the township committee without a careful examination being made by them as to the rights of the inhabitants of the township of Lakewood and the members of the general public to the use and enjoyment of Lake Carasaljo and the walks and drives surrounding it.
"18. That the township committee knew of the dedication of the property to the public use and that accordingly the purchase of the property constitutes an improper diversion of the funds of the township of Lakewood and is and will be a fraud upon the taxpayers of the township and to permit the township committee to carry out the agreement will be contrary to equity and good conscience.
"19. That if the lake, the drives and paths surrounding it were so dedicated to public use, the remaining property embraced by the terms of the agreement is of no substantial value."
The bill contains no charge of willful fraud, collusion or corruption on the part of the municipal authorities. The basis of the charge of fraud, shortly stated, is the allegation that the lake and all the lands and property the subject of the proposed contract have already been dedicated to public use by the defendant land association and its predecessors in title and that the purchase of that property by the township would be, in effect, purchasing something which the township already owns by a right of dedication; or, that at least such portions of the property as lie within the boundaries of lake drive, lake paths and Lake Carasaljo were subject to a public user and that the payment of $200,000 for the remaining lands not subject to such user would be an unconscionable performance by the township committee and one which this court should restrain. This allegation of fraud, of course, affords the only excuse for the filing of the bill in this court. Coast Co. v. Mayor, c., ofSpring Lake, 56 N.J. Eq. 615; Jackson v. Mayor, c., of Newark,53 N.J. Eq. 322; Berdan v. Passaic Valley SewerageCommissioners, 82 N.J. Eq. 235; affirmed, 83 N.J. Eq. 340; Cityof Millville v. Board of Education of Millville, 100 N.J. Eq. 162. *Page 374 
In the absence of fraud and where the proofs fail to show that the price to be paid is so in excess of the value of the property to be acquired as to shock the conscience, equity has no jurisdiction. McKinley v. Chosen Freeholders of Union County,29 N.J. Eq. 164; McCormick v. Mayor, c., of New Brunswick,83 N.J. Eq. 1; Watters v. Mayor, c., of Bayonne, 89 N.J. Eq. 384.
The allegations of fraud contained in the bill are based on the assertion, first, of an implied covenant as to user, arising from the fact that the land association, and its predecessors in title, in developing the village of Lakewood and in making sales of its property, publicly advertised Lake Carasaljo and Lake Drive and paths as attractions and inducements to purchasers of lots and exhibited to such persons maps upon which the lake, drive and paths were shown; and second, upon the fact of a public easement in the lake, drive and paths acquired by public user thereof for a period of over twenty years; and third, upon actual dedication by the filing of maps upon which the lake, drive and paths were delineated, and by conveyances of lands according to those maps and abutting on the lake and drive, one assertion being that upwards of four hundred deeds of conveyance of lots out of the tract of land of which the lands here involved are part, were made by reference to a map upon which Lake Carasaljo and Lake Drive and paths were particularly shown.
The evidence submitted in this cause indicated that a large part of the lands which now constitute the town of Lakewood were owned by one Joseph Brick in about 1860 and the settlement there was originally known as Bergen Ironworks, afterwards as Bricksburg, and now, Lakewood. A portion of the lands owned by Brick were conveyed by his heirs to the Bricksburg Land and Improvement Company about 1866. That company in 1870 conveyed a portion of its lands located on the south side of Lake Carasaljo to the American Roofing, Paving and Manufacturing Company, the name of which company was later changed to Bricksburg Manufacturing Company. The Bricksburg Manufacturing Company in April, 1871, mortgaged its lands to the Newark Savings Institution, *Page 375 
which later foreclosed the mortgage and purchased the property at the sheriff's sale held pursuant to a decree of this court. That institution later, in 1880, conveyed the property to Kimball and Davis, who held the land until April, 1920, when they conveyed to Bricksburg Land and Improvement Company. In the meantime, Kimball and Davis had conveyed certain water power rights in Lake Carasaljo with certain limitations, and previous to that time the former owner had granted certain rights to the water company. On the same date that the Bricksburg Land and Improvement Company acquired title from Kimball and Davis, April 1st, 1920, that company conveyed the tract, with certain exceptions, to the Carasaljo Land Company. These exceptions are quite important but without entering into detail as to them, it is sufficient to say that the exceptions included Lake Drive and other portions of the land lying to the southward of Lake Carasaljo and which are included in lands described in the contract the subject of this suit. In July, 1921, the Bricksburg Land and Improvement Company was merged with the defendant Lakewood Hotel and Land Association and it was as a result of that merger that the defendant association acquired title to the remaining portion of the American Roofing, Paving and Manufacturing Company tract which was the subject of the foreclosure sale already referred to. The description of the property contained in the mortgage above referred to excepted certain lands described according to lot and block numbers as shown on a map of the property of the Bricksburg Manufacturing Company. The same description is contained in the special master's deed. No authentic map of the property of the Bricksburg Manufacturing Company tract was put in evidence. A large map known as the "Beers" map, to which reference will hereafter be made, was offered in evidence but excluded. Upon this map was superimposed what purported to be the Bricksburg Manufacturing Company map, but it was not offered in evidence except in conjunction with the "Beers" map.
The evidence claimed to indicate an implied covenant as to user consisted of advertisements by the defendant association *Page 376 
and its predecessors in title and representations by its officers to the effect that the lake, drive and paths were for the use of the public. As to the advertisements, they appeared in a newspaper published in Lakewood from 1871 to 1878. The files of this paper during that period were offered in evidence and some were admitted. In these advertisements the natural advantages of the town, its healthful climate, convenient location and other attractions were naturally emphasized, but there is nothing except a statement that "a public park is to be laid out with walks and avenues and will connect with the beautiful lake drive of two and a half miles in extent around Lake Carasaljo," which could form the basis of any implied covenant. In this respect this case differs from De Long v. Spring Lake and Sea GirtCo., 65 N.J. Law 1, and Lennig v. Ocean City Association,41 N.J. Eq. 606, cited by counsel for complainant. In those cases there was a very definite representation from which such a covenant could be implied. Complainants contend that the words "a public park" in the advertisements refer to the land around the lakes, but I do not think so. There was a plot of ground specifically referred to in some of the deeds offered in evidence as a park and evidently it was to that park that the advertisements referred; but even if complainant's contention is correct, the language is only a statement or promise of future intention or action. Any park subsequently laid out would have fulfilled the promise and there was evidence that a park was subsequently laid out at the corner of Main street and Madison avenue. There was no issue as to that park presented by these pleadings, however, and I mention it merely to indicate that the language of the advertisements has no certainty of reference. Only one witness was produced, the witness, John Thompson, who was shown to have been induced by these advertisements to purchase lots in Lakewood. His purchase was in 1873 and the result of an advertisement appearing in the "New York Sun." The contents of that advertisement, however, are not disclosed and the witness' testimony with respect to it is very meagre and indefinite and no implied covenant can be inferred from *Page 377 
his testimony; nor, in my judgment, can any implied covenant such as is here claimed be inferred from the language of the other newspaper advertisements. It is significant also that a considerable portion of the lands with respect to which this implied covenant is asserted was not owned by the company at the date of these advertisements, some being later acquired in 1886, 1919, 1920 and 1921, and nowhere does it appear that there was any representation by advertisements that the lake, drive or walks were to be devoted to public use. At best, the advertisements could be considered as "sales talk," and could not, of course, apply to land not owned by the company at that time. Without going into further detail on this question, I think it clear that no implied covenant such as is here claimed arose from the newspaper advertisements. As to the representations by officials of the company the only representations which could be suggested as a basis for such a covenant were those alleged to have been made by Captain Bradshaw to the complainant Soper in 1902 or 1903. Mr. Soper purchased later three-quarters of a mile or more from the lake and drives, and accepting his testimony in its strongest sense, it cannot spell out an implied covenant of public user or accomplish a dedication to the public. But even if it could the court would hardly be justified in a finding of dedication or implied covenant as to user upon the indefinite recital of a conversation between complainant and an officer of the company who is now dead and consequently not here to refute that statement.
As to the dedication by means of filed maps showing the lake, drives and paths for public use and the conveyances of lands abutting on the lake and lake drive, it seems to me that the proof wholly fails. There is in evidence no map showing Lake Drive or paths and there are but two maps (Exhibits D-9 andD-10) which show the lake; but on those maps that is shown without any indication that it is a part of the development or that it is intended for public user. Complainant argues that West End avenue as shown on Exhibit D-9 is the same as Lake Drive as it now exists, but there is, as I recall it, no evidence to this effect and I do not understand West *Page 378 
End avenue and Lake Drive to be the same. There was, however, a map offered in evidence which was known as the "Beers" map, dated 1873, upon which Lake Carasaljo appeared and Lake Drive was shown both to the northward and southward of that lake. This was a map of Ocean county upon which was superimposed a sectional map of Lakewood, but that map differed widely from the filed maps of the Lakewood Hotel and Land Association and its predecessors in title in that on the filed maps Lake Drive was not shown at all, either to the northward or southward of Lake Carasaljo, and Lake Carasaljo was not definitely delineated, except as already stated. The Beers map was also the only map upon which any portion of the land lying to the southward of Lake Carasaljo was shown as having been laid out in blocks, lots and streets. That map was first offered and tentatively admitted in evidence on the assertion by counsel for complainants that over four hundred deeds had been made by the defendant land association by reference to that map. It was clearly demonstrated later in the course of the hearing, however, that this statement was without foundation in fact; that there was no reference to the Beers map in any of the deeds mentioned, some of which antedated several years the date of the map itself, and evidence offered by the defendants indicated clearly that the map referred to in the deeds was the official map of the association, known as the "Gould" map, the earliest copy of which was dated 1871 (ExhibitD-23) and which was later, in 1873, filed in the Ocean county clerk's office (Exhibit D-9) and it is by these maps only, to which reference is made in the deeds, that the land association is bound. For these reasons the Beers map was excluded. Those maps (Exhibits D-9, D-10 and D-23) do not, as already stated, show Lake Drive or paths, nor is there any map in existence, so far as is shown by the evidence submitted, which indicates any portion of the lands lying to the southward of Lake Carasaljo as having been plotted prior to 1920 at which time a portion of those lands was sold by the defendant association to the present owner. It is true that there are indications that as early as 1870 a portion of the *Page 379 
land lying to the south of Lake Carasaljo which was conveyed to the American Roofing, Paving and Manufacturing Company was plotted in blocks, lots and streets, but the map is not before the court and the supposed copy of that map appearing on the Beers map was neither offered nor admitted in evidence, except as above mentioned. True, it was included in the offer of the whole of the Beers map, but other discrepancies and inaccuracies on the Beers map were sufficient to exclude the whole. It is quite apparent from the evidence that the town of Bricksburg, now Lakewood, was mapped sectionally from time to time, new plottings being made as occasion arose, the developers feeling their way toward ultimate, definite plans. It is also claimed that a copy of the Beers map hung on the wall of the office of the Bricksburg Land and Improvement Company in the seventies and eighties when that office was maintained by some of the early officers of the company. And one witness testified that a copy of the map hung on the wall of Captain Bradshaw's private office when he was connected with the land company. There was no evidence, however, that any sales or conveyances were ever made from it, and that they were was vigorously denied by the present officers of the company. The map was referred to by some of the witnesses as a "curiosity," as indeed it is. It is not a map published by the defendant association or its predecessors in title, but is one of those curios compiled and published to sell, and is quite evidently a piece of patchwork, upon which is superimposed village maps purporting to show the location of particular properties, buildings, residences, c. To hold that the defendant association is bound by anything appearing on that map would in my judgment be to charge them with something for which they are in no way responsible and it is significant that no other map among the many offered in evidence or disclosed by the research of counsel on both sides of this controversy affords any foundation whatever for much of the information appearing on the Beers map.
There is but one conveyance from the predecessor in title of the defendant association of land binding on Lake Drive. *Page 380 
This was a conveyance of a plot located at Myrtle Place and Lake Drive on the south side of the lake and was of a portion of the property south of the lake which was early conveyed to the American Roofing, Paving and Manufacturing Company, and which had apparently at some time been mapped and plotted. Two or three other conveyances were shown to have been made from this map but this was the only one which abutted on Lake Drive. If an authentic map of this plotting had been produced and offered in evidence, and if the Lake Drive as shown thereon could thereby have been definitely located, this court would probably have been justified in finding a dedication of the streets shown on that map; but no such map is in evidence and the burden of proving the map is upon the complainants. The court would not be justified in a finding of dedication without means to determine the location of the lands so dedicated, and to constitute a good dedication a definite and certain description of that which is proposed to be dedicated is necessary. 18 Corp. Jur. 57, section 40 and notes;page 67, section 57. That the burden of proof to establish a dedication is on the party asserting it is elementary and "the proof must be strict, cogent and convincing." 18 Corp. Jur. 96.
It is apparent that a finding of dedication of the streets supposed to have been shown on this map would be futile because of the impossibility of definitely locating them from the evidence now before the court, and I can only say that dedication is not proved. The existence and extent of a dedication on a map from which lots are sold is a question of intention, consisting of mixed law and fact (Blank v. Borough of Haddonfield,96 N.J. Eq. 641); the intent to dedicate is here wholly lacking.
But admitting for the sake of argument, that there was a dedication of Lake Drive or some portion thereof as shown on some map not produced, that fact would not justify this court in enjoining the execution of the contract here in question. The land comprised in Lake Drive is an inconsiderable portion of the whole area of land proposed to be acquired by the township. The total area of the land the *Page 381 
subject of the proposed contract is approximately one hundred and sixty-five acres. In all of South Lake Drive and Bradshaw road there are but two and ninety one-hundredths (2.90) acres. The total area of Lake Drive and paths on both sides of the lake is but nine and seventy one-hundredths (9.70) acres.
There is one other deed from the Bricksburg Land and Improvement Company upon which the complainants rest their claim of dedication of the lake and that is the deed to Oak Knoll Development Company, dated December 30th, 1916. It is claimed that by this deed the Oak Knoll Development Company acquired title to the lands lying under the waters of the lake to the center thereof, and that consequently the defendant association is unable to now convey this portion of the lake to the township. Without reciting in detail the descriptions and provisions contained in this deed, I think it quite apparent that the deed conveys and was intended to convey only to the low water line of the lake. The case of Simmons v. City of Paterson, 84 N.J. Eq. 23,
cited by the complainants, has no application to this conveyance. Vice-Chancellor Stevenson there based his decision upon the absence from the proofs in that case of many of the facts proved in the case at bar. Here the owner and grantor had large tracts of land running to the lake, and large additional tracts covered by and surrounding the lake and had already conveyed to the Lakewood Water Company or its predecessor water power rights, and had reserved in the lake certain important rights. Further than this, the original conveyances to the American Roofing, Paving and Manufacturing Company and to Kimball and Davis limited the conveyance to the edge of the water in Lake Carasaljo. All these facts were absent from the Simmons case and they indicate here not only the necessity, but the intention on the part of the land company to retain control of the lake and the land beneath it, subject to the rights previously granted to the water company.
With respect to the easement of public user, it was shown quite clearly that from very early times the lake drive and paths had been used at will by the inhabitants and visitors to *Page 382 
Lakewood during the winter season and especially by the guests of the two hotels, the Laurel House and the Laurel-in-the-Pines, and it is from such user that the public right is claimed. But it was also convincingly shown that from the very earliest times all of the walks and drives were laid out, constructed, policed and maintained by the defendant land association and its predecessors in title at their own expense, and that many thousands of dollars had been spent by this company in that work and that the township authorities had never spent anything toward the upkeep or maintenance of this drive or the walks. It was also shown that the defendant association and its predecessors in title had, since the very earliest times, posted throughout the woods along the paths and drives and at the entrance and sides thereof, signs and notices to the effect that they were private property. At one point on Lake Drive at the entrance thereto at Case road, near the Gould property, a large sign supported by posts on either side of the drive was placed over the driveway. On this sign appeared the words "One-Way Private Road — Do Not Enter." Similar signs were placed at other beginning and ending points of the drive and paths. Another large wooden sign erected by the Bricksburg Land and Improvement Company was placed alongside of Lake Drive and contained the following:
 "NOTICE.
This roadway is the property of Bricksburg Land and Improvement Company. The company has never set apart, surrendered or otherwise dedicated said roadway to public use. All persons using said roadway do so in subordination to the rights and by permission of the owner and subject to this notice.
(Signed) BRICKSBURG LAND AND IMPROVEMENT CO."
There were several notices of similar import placed about the property — notices prohibiting gunning, dumping of rubbish, smoking, trespassing with dog or gun, prohibiting bicycling or horseback riding on lake paths, warning against mutilating of bridges, benches, trees or shrubbery, the molestation or frightening of squirrels, birds or fowl, and also a notice containing the following: *Page 383 
"Persons going upon the ice do so at their own peril and without the permission or invitation of the owners, express or implied."
These and similar notices were posted along the drive and paths throughout their entire length. It also appeared conclusively that uniformly from the close of the season in May to the beginning of the ensuing season in October of each year, the walks and drives were closed to the public by barricades and obstructions of various kinds and also by signs indicating that they were so closed. The posting of these signs and the barricading of the walks and drive extended over a period of at least forty years. The barricading of the drive and walks and the posting of the signs was denied by some witnesses, but the weight of testimony was to the effect already stated. While my own knowledge is not evidence nor can I take judicial notice of those facts within my own knowledge, yet that knowledge enables me to discriminate between those witnesses who testified truthfully on this point and those who did not. My own personal knowledge is to the effect that for at least twenty years last past the walks and drives around the lake have been periodically barricaded and closed to the public and that many of the notices already referred to have, during that period, been prominently posted throughout the length and breadth of the property the subject of this suit. A public user, to ripen into an easement, must have been continued, uninterrupted and adverse for a period of twenty years (Lehigh Valley Railroad v. McFarlan, 30 N.J. Eq. 180;Cobb v. Davenport, 32 N.J. Law 369; Clement v. Bettle,65 N.J. Law 675), the theory of such user long continued being that it is founded on a lost grant. Cobb v. Davenport andClement v. Bettle, supra. The evidence in this cause precludes any conclusion or presumption of a public user ripening into an easement. It is quite apparent that whatever user the public had was permissive only and was not uninterrupted. It is elementary that a permissive user for the statutory period, although uninterrupted, will not ripen into an easement.Pennsylvania Railroad Co. v. Hulse, 59 N.J. Law 54. *Page 384 
The user with respect to the lake, which is urged as resulting in a public easement, consisted of fishing, sailing, boating, skating, c., thereon by the public. Undoubtedly the public did use the lake with more or less freedom, greater in the earlier days of this development than latterly; but to contend that such user ripened into a public easement to the extent of depriving the association of its property, rights and control seems to me the height of absurdity. There is cogent evidence indicating that the association and its predecessors in title have always retained control of the lake and its waters, leasing it, issuing permits for boating thereon, and fishing therein and in various ways exercising complete control over it. Very early in the history of Lakewood the predecessors in title of the defendant association conveyed certain rights in the lake to a company to which rights the Lakewood Water Company ultimately succeeded. This was evidential of an intention to retain ownership and control of the lake. There were introduced in evidence a large number of fishing permits issued by the secretary of the company to individuals applying therefor. These permits were collected by an employe of the defendant association who had charge of the association's boathouse at the edge of the lake, and the permits dated back as far as 1896. Permission was also granted by the defendant association to the Carasaljo Launch Company, a corporation, to operate a power boat line on the lake on a regular schedule, and, in general, it may be said that the company exercised the same control and supervision over the lake as it exercised over the land around the lake. Such use as was had of the lake by the public was permissive, was not continuous and never ripened into an easement.
I have gone somewhat into detail on the question of dedication and user because it is upon the alleged public right that the charge of fraud in this case is based. I have considered this question with some hesitation, notwithstanding its importance as a public question to the people of the village of Lakewood, because I considered the question of public right by dedication, user or implied covenant primarily a legal one, depending upon facts more appropriately to be *Page 385 
considered and decided by a jury in a court of law then by an equity judge sitting alone. It was urged, however, by all counsel, that since the fact of dedication or the existence of the alleged right was the foundation of the charge of fraud, it became incumbent upon me to decide this momentous question and this is the view that I have taken of the matter. In his brief counsel for the complainant now asks that an issue of fact be framed by this court and submitted to a jury for its decision, this court meanwhile retaining the cause. Had this suggestion been made, and it was invited earlier in the proceedings and before the issue was fully tried here, it is quite probable that the request would have been granted. The suggestion comes too late now. My conclusion is that there was never any dedication of any of the property described in the contract the subject of this suit, except possibly a portion of Lake Drive lying to the southward of Lake Carasaljo, formerly owned by the American Roofing, Paving and Manufacturing Company; but with respect to this portion of Lake Drive there was no reliable proof and no evidence from which the dedicated land might be located. The burden of proof being on the complainants with respect to all these details, I am obliged to find against the complainants with respect to this portion of Lake Drive also. Nor was there any express or implied covenant on the part of the association or its predecessors in title as to the use to which the property would be put. I have already indicated that public user of the property in question did not ripen into an easement.
But even if I am entirely wrong as to this important question, I am of the opinion that the bill must be dismissed and the restraint imposed in the preliminary injunction dissolved. In effect, the bill charges that the members of the township committee were well aware of the dedication of the lands in question or that they were subject to public user and that being possessed of this knowledge the members of the committee, disregarding the rights and interests of the public, had agreed to purchase the lands involved without proper and sufficient consideration and without any attempt *Page 386 
to protect the rights of the public. These charges were made, not so specifically in the bill of complaint itself, but by assertions and innuendo during the course of the hearing, so that it became incumbent upon the members of the committee to explain in detail the consideration that the committee had given to the proposal of the purchase of these lands.
That the defendant township committee had ample statutory authority to acquire the lands the subject of this contract cannot be and is not denied. Sufficient authority will be found in what is commonly known as the Home Rule act (chapter 152 P.L.1917 p. 319), and particularly in sections 452 and 454 of that act; but other authority is not wanting as will be found by an examination of the statutes under the title "Municipal Corporations." It is quite plain that the question of the advisability of the purchase of the lands in question by the township of Lakewood is a purely discretionary one and one with which this court has no right to interfere except on the ground of fraud. A court of equity will not exercise its injunctive powers to restrain municipal bodies in official matters left by law for their discretion unless special equities exist calling for such injunction. Tucker v. Board of Chosen Freeholders ofBurlington County, 1 N.J. Eq. 282 (at p. 287); McKinley v.Chosen Freeholders of Union County, supra; McCormick v. Mayor,c., of New Brunswick, supra; Watters v. Mayor, c., ofBayonne, supra. So long as the municipal authorities acted in good faith and exercised their discretion within their appropriate and legal limits this court has no jurisdiction to interfere. Relief to the taxpayer, if any, must be sought in the law courts. Ludlow v. Executors of Ludlow, 4 N.J. Law
[*]387; Berdan v. Passaic Valley Sewerage Commissioners,supra; Plum v. Morris Canal and Banking Co., 10 N.J. Eq. 256
(at p. 260); Allen v. Board of Chosen Freeholders ofMonmouth County, 13 N.J. Eq. 68 (at p. 76); Pope v. Town ofUnion, 18 N.J. Eq. 282 (at p. 284); High Inj., p. 1267. The power attempted to be exercised by the defendant committee in the instant case being a discretionary one, specially delegated *Page 387 
to that body by the legislature, the committee's powers exercised within their authority are supreme. Bond v. Mayor, c.,Newark, 19 N.J. Eq. 376 (at p. 384); Schumm v. Seymour,24 N.J. Eq. 143 (at p. 147); Cape May and Schellenger's LandingRailroad Co. v. City of Cape May, 35 N.J. Eq. 419 (at p.420); Oakley v. Atlantic City, 63 N.J. Law 127.
In connection with the suggestion of insufficient consideration and hasty action with respect to the proposed purchase by the defendant township committee, a consideration of the facts leading up to the proposed contract is important. It appears from the testimony that as early as March, 1923, the question of the acquisition by the township of Lakewood of Lake Carasaljo and the lands surrounding it was taken up by a committee appointed for that purpose with the defendant association and that association expressed its willingness to convey the lands to the township for $450,000. Because the price was considered too high the matter was dropped for the time being; but in April, 1927, the question was again taken up, and for a period of eight months thereafter, or until sometime in December, 1927, the matter was in the forefront of all discussions in the township committee meetings. It became the subject of such local moment and concern that civic organizations of the community discussed it openly and publicly and urged its purchase by the township committee. Boards of directors of local banking institutions did likewise and a public mass meeting was held at the municipal building in Lakewood at which the subject was freely discussed and considered. A citizens' committee was appointed at this mass meeting for the purpose of conferring with the municipal authorities and such a joint conference was had. Numerous petitions, letters and telegrams relating to the subject were addressed to and received by the township committee. No public question ever received more complete consideration, or was more thoroughly discussed by the committee vested with the responsibility of action, or by the public concerned, than the question of the purchase of the lands here involved by the township of Lakewood. It *Page 388 
was recognized by the township committee that there was some question as to the dedication of certain portions of this land to public use, but it was also recognized that the determination of that question involved protracted litigation and consequent expense. The land company insisted that it owned the property and that the public had no rights therein. The facts respecting the use of this land and the interruption of that use by the defendant association and its predecessors in title, the posting of the signs, c., were all within the knowledge of the members of the township committee. In their discussions they had the benefit of competent legal advice and the basis upon which a claim of dedication or public right might be predicated were explained to the committee by its counsel. At the time of the final action by the committee which is here attacked, the defendant land association had seen fit to bar the lake drive, walks and lake from further use by the public. It was important to the business interests of Lakewood that this property be again opened to public use as promptly as possible. The urgency of this situation, as well as the elimination of the question concerning the public rights, were moving factors in the ultimate action of the committee. It was determined by the committee, in the exercise of the discretion committed to them by the legislature, that it was advisable for the municipality to own and control this property for the public benefit. And in this opinion the complainant MacMillan joined, holding out, apparently, only because he thought the price too high. It appears that as a result of the negotiations between the township committee and the defendant association the asking price for the land was reduced from $450,000 to $190,000 net. Barring easements, public and private, the court must assume that the price finally agreed upon is not unconscionable, and that it is fair and just. There is no allegation to the contrary in the bill of complaint nor was it ever suggested, except at the very close of the hearing in this cause, which lasted for six days, that the property involved was not worth the purchase price agreed upon, assuming that the public rights claimed did not exist. It is true *Page 389 
that the very last witness called in this case was a witness called by complainants to testify concerning the value of this land. The issue not having been previously raised, no notice of the intention to submit evidence on this point having been given, and the defendants not being prepared to meet it, the witness was not permitted to testify. Complainants then sought to amend their bill of complaint but a motion to that end was denied because it came too late.
What I have said with respect to the consideration and action of the township committee has been without regard to the provisions of the contract itself and merely to indicate that there was full and free discussion and thorough consideration of the matter by the committee and by the public, and that there was no undue haste, suppression of facts, concealment, or improper conduct in any sense of the word by the members of the township committee. An inspection of the contract itself, the execution and performance of which this bill seeks to enjoin, indicates, as I suggested at the trial, that the rights of the municipality are fully protected by its terms. It provides for the purchase by the township from the land company of certain lands therein particularly described, consisting of approximately one hundred and sixty-five acres, seventy-four of which are in the main body of the lake, and provides that the land association shall convey the property described in fee-simple, without restrictions and free from all liens and encumbrances except such as are specifically mentioned therein, but none of which exceptions interfere with the public use to which the lands were to be devoted. Obviously, if the lands and lake had been already dedicated to public use or if public easements had been acquired therein by user, as was alleged in the bill of complaint, the company could not perform the contract and the township would not be obliged to perform. The municipality could not be compelled by the land association to accept a conveyance and to pay the purchase price provided for in the agreement unless the property were conveyed free and clear of all easements and encumbrances and there is no suggestion that the committee would be faithless to its trust and voluntarily *Page 390 
accept an encumbered title. An examination of the contract will indicate to any fair-minded person that it was carefully prepared with a view to protecting the rights of the municipality and it seems to me that those rights are amply protected. The intention of the committee as inferred from the terms of the contract was to purchase the lands therein described only if the company had title thereto and could convey free from all encumbrances, and the testimony of the committee members indicated their intention to require strict adherence to its terms by the defendant association. The contract provides for exhaustive title examinations which will disclose the existence of easements and encumbrances, if any, which would preclude the performance by the defendant association. The price being fair, as I must assume, how can it be said that there was any fraud or unconscionable conduct on the part of the committee? Under the circumstances I have no alternative but to advise a decree dismissing the bill of complaint and I shall do this upon the ground, first, that there has been no dedication of the lands to public use; second, that there have been no public rights acquired by user; third, that there has been no fraudulent act or conduct on the part of the defendants, and fourth, that by the terms of the contract itself the rights of the municipality and the public are amply protected. *Page 391